NATIONAL AWARENESS FOUNDATION; Child Protection Program Foundation; Lee DeYoung; Shaunnah Hammonds; Jacquelyn L. Escoban; Anthony D. Grady; Rhonda Lee Morales, Plaintiffs–Appellants,

v.

Robert ABRAMS, Attorney General of the State of New York; Gail S. Shaffer, Secretary of State of the State of New York, Defendants–Appellees.

No. 507, Docket 94–7478.

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1994.

Decided March 28, 1995.

Errol Copilevitz, Kansas City, MO (John P. Jennings, Jr., Copilevitz, Bryant, Gray & Jennings, P.C., Kansas City, MO, of counsel), for plaintiffs-appellants.

David G. Samuels, New York City (G. Oliver Koppell, Atty. Gen., Pamela A. Mann, Asst. Atty. Gen., New York City, of counsel), for defendants-appellees.

Nicholas Gilman, Esq., Washington, DC (Gilman, Pangia & Balsamo, Washington, DC, William J. Olson, John S. Miles, William J. Olson, P.C., McLean, VA, Mark B. Weinberg, Weinberg & Jacobs, Rockville, MD, of counsel), for amicus curiae Free Speech Coalition, Inc.

Before: CARDAMONE, PIERCE, and MINER, Circuit Judges.

PIERCE, Senior Circuit Judge:

Appellants National Awareness Foundation, Child Protection Program Foundation, Lee DeYoung, Shaunnah Hammonds, Jacquelyn L. Escoban, Anthony D. Grady and Rhonda Lee Morales (collectively "plaintiffs" or "appellants") appeal from a judgment entered on April 18, 1994 in the United States District Court for the Southern District of New York (Gerard L. Goettel, *Judge*), which dismissed their complaint against the New York Attorney General and the New York Secretary of State (collectively "defendants" or "appellees"). This action was brought under 42 U.S.C. § 1983 and challenged the constitutionality of N.Y. Executive Law § 173–b(1), which requires professional solicitors in the employ of professional fundraisers to register with the State and pay an $80 annual fee before conducting fundraising activities in New York. Plaintiffs' complaint sought, *inter alia,* a declaration that § 173–b(1) is unconstitutional under the United States Constitution on the grounds that the statute violates (1) the First Amendment as an unconstitutional tax and prior restraint on protected expression; and (2) the Equal Protection Clause of the Fourteenth Amendment by requiring $80 fees from solicitors working for professional fundraisers, while exempting officers, volunteers and employees of charitable organizations or fundraising counsel. In an earlier ruling, *National Awareness Found. v. Abrams,* 812 F.Supp. 431 (S.D.N.Y.1993) (*"National Awareness I"*), the district court held that § 173–b(1) would not violate the First Amendment if New York established a reasonable connection between the $80 fee and the administrative and enforcement costs associated with regulating professional solicitors each year. However, the court denied cross-motions for summary judgment on that claim because the factual record was insufficient to permit a ruling as a matter of law. Apropos the equal protection claim, the court granted summary judgment in favor of defendants, finding that § 173–b(1) was sufficiently tailored to serve the governmental interest in regulating independent professional solicitors who were otherwise unaccountable. The parties agreed to a Joint Stipulation of Facts, and in a later decision, *National Awareness Found. v. Abrams,* 848 F.Supp. 511 (S.D.N.Y.1994) (*"National Awareness II"*), the district court

granted judgment on a stipulated record in favor of defendants, holding that § 173–b(1) did not violate the First Amendment because the $80 fee was nominal and reasonably connected to the administrative and enforcement costs of the registration system. On appeal, appellants challenge the district court's rulings in *National Awareness I* and *National Awareness II* that § 173–b(1) is not unconstitutional under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. We affirm.

## BACKGROUND

The solicitation and collection of funds for charitable purposes in New York is governed by N.Y. Executive Law § 171–a *et seq.* ("Article 7–A"). Article 7–A sets forth, *inter alia*, registration requirements for charitable organizations, professional fundraisers and professional solicitors seeking to engage in fundraising activities in New York. This action, brought under 42 U.S.C. § 1983, challenges the constitutionality of § 173–b(1) of Article 7–A, which provides in pertinent part:

> No person shall act as a professional solicitor in the employ of a professional fundraiser ... before he has registered with the secretary.... Application for registration ... shall be accompanied by a fee in the sum of eighty dollars. Such registration ... shall be for a period of one year....

A "professional solicitor" is defined as "[a]ny person who is employed or retained for compensation by a professional fund raiser to solicit contributions for charitable purposes...." *Id.* § 171–a(5). Section 171–a(4) of Article 7–A exempts a "bona fide officer, volunteer or employee of a charitable organization or fund raising counsel" from the definition of "professional fundraiser," and, thus, from the registration requirements of § 173–b(1).

Plaintiffs are five individual professional solicitors who have paid the $80 fee, and two charitable organizations that utilize the services of professional solicitors. Defendants are the New York Attorney General and the New York Secretary of State, both of whom are charged with the administration and enforcement of Article 7–A. On January 31, 1992, plaintiffs filed an amended complaint in the district court seeking a declaration that § 173–b(1) is unconstitutional under the First and Fourteenth Amendments, and a permanent injunction enjoining its enforcement. They alleged that the $80 fee required by § 173–b(1) violates (1) the First Amendment as an unconstitutional tax and prior restraint on protected expression; and (2) the Equal Protection Clause of the Fourteenth Amendment by requiring $80 fees from solicitors working for professional fundraisers, while exempting officers, volunteers and employees of charitable organizations or fundraising counsel from similar registration and payment of fees.

The parties filed cross-motions for summary judgment. On the First Amendment claim, plaintiffs argued that the $80 fee constituted an unconstitutional tax and prior restraint on protected expression because the fee was not nominal and the revenues collected were not used solely to defray the State's administrative costs associated with the statute. Defendants countered that plaintiffs focused solely on the administrative costs of the Office of Charities Registration ("OCR"), the department responsible for collecting the fee, while ignoring the costs to other state agencies of enforcing § 173–b(1); they pointed out that the Charities Bureau of the Attorney General's office provided support services to OCR, as well as investigated and prosecuted violations of § 173–b(1). In *National Awareness I*, the district court narrowed the question of the fee's acceptability under the First Amendment to two issues:

> First, can enforcement costs be considered when judging a fee's impact on a regulated activity, or are only administrative costs—meaning the costs of processing and issuing fees—to be considered? And if yes, have defendants offered evidence sufficiently showing the link between the fee and their administrative and enforcement costs?

812 F.Supp. at 433–34. It found that the costs of enforcing § 173–b(1) could be considered, and concluded that "if New York establishe[d] a reasonable connection between the $80 registration fee for professional solicitors and the particular administrative and en-

forcement costs each year associated with its regulation of these fundraisers, the fee would not represent an unconstitutional prior restraint on plaintiffs' 1st Amendment rights." *Id.* at 434. Since the factual record was insufficient to permit a ruling as a matter of law, the court denied both plaintiffs' and defendants' motions on this claim. *Id.* at 435.

On the equal protection claim, plaintiffs argued that the statute's distinction between professional solicitors working for professional fundraisers who were required to pay the fee, and officers, volunteers or employees of charitable organizations or fundraising counsel, who were excluded from the definition of "professional fundraiser" and therefore not subject to the fee, was an unconstitutional distinction that discriminated against them on the basis of the content of their speech or based upon the nature of their employment. Defendants responded that in-house solicitors were not similarly situated to professional solicitors necessitating identical treatment under the Equal Protection Clause. The court ruled in favor of defendants, noting that all professional solicitors not working in-house for a charitable organization were charged the $80 fee; that all charitable organizations were required to register with the State and to comply with even more comprehensive regulations; that content of speech played no role in the distinction; that plaintiffs offered no evidence indicating that smaller charities were unable to conduct their own fundraising or comply with the statutory requirements; and that even assuming a professional solicitor could not afford the fee, nothing stopped a charity from making its solicitations without employing professional fundraisers. *Id.* The court concluded that New York's regulation of all charitable fundraisers and organizations was devised to protect the public from unsupervised fundraising activities and that the system was "tailored to serve the particular government interests in regulating both charitable organizations and independent professional fundraisers." [1] *Id.*

Thereafter, the parties agreed to a Joint Stipulation of Facts, stipulating to the following facts which remain uncontested on this appeal. The revenues of the Secretary of State in the area of charitable regulation are collected by OCR pursuant to Article 7–A, but are turned over to the State and credited on a monthly basis to the State's general fund. The registration fees collected by OCR are not earmarked in any way for the enforcement activities regarding the registration laws. None of the revenues collected by OCR go directly towards the Charities Bureau's budget, although they do go to the State's general fund, from which the Charities Bureau is funded. OCR has authority to bring administrative proceedings as a method of enforcing Article 7–A, and has on occasion exercised that authority. The Charities Bureau is also responsible for the enforcement of Article 7–A, and has brought numerous actions and commenced many investigations in the enforcement of Article 7–A. The Attorney General's office has the following exclusive powers:

> 28. The Attorney General's office is the only New York State agency authorized by ... Article 7–A to bring actions in court, to seek injunctive relief, to issue subpoenas and take testimony, and to seek from a [c]ourt an "order awarding restitution and damages and costs; and removing any director or other person responsible for the violation of this article; dissolving a corporation and other relief which the [c]ourt may deem proper...." Executive Law § 175.

(Joint Stipulation of Facts ¶ 28). The enforcement efforts of the Attorney General's office have not overlapped or duplicated any administrative proceedings commenced by OCR. On the contrary, the two agencies keep each other advised of the court actions filed by the Attorney General's office and of the administrative proceedings commenced by OCR in order to avoid overlap or duplication. Unregistered or delinquent organizations or individuals are referred to the Chari-

---

**1.** Plaintiffs moved for certification of an interlocutory appeal on the dismissal of their equal protection claim and the holding that enforcement costs could be considered when assessing the nominality of a registration fee. We denied leave to file an interlocutory appeal in a mandate dated July 13, 1993.

ties Bureau by OCR when OCR's efforts to secure statutory compliance have proven unsuccessful and litigation appears appropriate.

The parties further stipulated to the following figures:

20. Defendants admit that the following is a true and accurate summary reflecting figures prepared by [OCR], of the total revenues collected during the past six fiscal years ending March 31 by that office:

1992 $710,961.00
1991 $610,532.00
1990 $551,403.00
1989 $335,902.00
1988 $271,655.00
1987 $255,783.00

21. The approximate cost to [the State] of [OCR] for the fiscal years ending March 31, in 1992, 1991, 1990, 1989, 1988, and 1987 was as follows:

1991–92: $385,708.00
1990–91: $325,601.66
1989–90: $391,893.24
1988–89: $409,790.92
1987–88: $388,477.49
1986–87: $366,197.60

(These expenses do not include the amount spent by other program areas of the Department of State to support OCR activities. They also do not include costs incurred by other state support agencies.... Finally, they do not include the enforcement costs of the Attorney General's office.)

22. The filing fees received by OCR from professional solicitors who register pursuant to ... § 173–b(1), for the fiscal years ending March 31 between 1989 and 1993, were as follows:

1992–93: $116,480
1991–92: $140,880
1990–91: $ 99,120
1989–90: $100,960
1988–89: $ 33,760

The annual cost to [the State] of OCR's administrative activities with respect to registered and delinquent professional solicitors is in excess of $20,000.

. . . .

29. Between 20 and 25 percent of the resources of the Charities Bureau are devoted each year to the administration or enforcement of ... Article 7–A, including § 173–b(1).

30. The approximate cost to [the State] of the Charities Bureau for the period April 1, 1991, through March 31, 1992, was $2,949,715.61. The approximate cost of the Charities Bureau to [the State] for the period April 1, 1992, through March 31, 1993, was $3,187,991.35. This was based on personal services of $1,900,959.00, fringe benefits and direct costs (calculated at 35 percent of personal services) of $665,335.65, building related expenses of $431,600.80, and other non-personal services (calculated as 10 percent of personal services) of $190,095.90.

The approximate costs in the three prior fiscal years, ending March 31, were as follows:

1990–91: $3,185,835.43
1989–90: $2,921.878.44
1988–89: $2,725.088.13

. . . .

32. The Charities Bureau estimates ... that more than 5 percent of the resources of the ... Charities Bureau (or at least $150,000, based on the approximately $3,000,000 annual budget of the Charities Bureau) are devoted to actions, investigations, litigation, and compliance efforts with respect to registered and delinquent professional solicitors pursuant to § 173–b(1)....

(Joint Stipulation of Facts ¶ 20–32).

The final paragraphs of the stipulated facts summed up these findings:

40. The fees received by [the State] through the registration of professional so-

licitors with [OCR], pursuant to ... § 173–b(1) ... exceed the administrative costs incurred by OCR in administering § 173–b(1).

41. The costs incurred by [the State] in the administration and enforcement of ... § 173–b(1) exceed the fees received ... [under] § 173–b(1) ... if both the administrative costs incurred by OCR and the enforcement costs incurred by the Attorney General's office are considered.

(Joint Stipulation of Facts ¶ 40–41).

After stipulating to these facts, the parties filed cross-motions for judgment on a stipulated record. In *National Awareness II*, the district court granted defendants' motion, and denied plaintiffs' motion. 848 F.Supp. at 513. The court ruled that the stipulated record established that the $80 fee imposed by § 173–b(1) did not violate plaintiffs' First Amendment rights, concluding that "a flat annual registration fee for all professional fundraisers [was] permissible under the First Amendment when, as here, it [was] nominal, and [was] reasonably connected to the administrative costs, including enforcement costs, of the registration system."[2] *Id.* Judgment was entered dismissing the complaint on April 18, 1994. This appeal followed.

## DISCUSSION

Appellants appeal from the district court's rulings in *National Awareness I* and *National Awareness II* that § 173–b(1) is not unconstitutional under the First Amendment and the Equal Protection Clause of the Four-

teenth Amendment. The district court decided these issues based on the parties' cross-motions for summary judgment and cross-motions for judgment on a stipulated record. Therefore, the standard of review is *de novo. John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 363 (2d Cir.1994); *May Dep't Stores Co. v. International Leasing Corp.*, 1 F.3d 138, 140 (2d Cir.1993).

### A. First Amendment

■ Appellants first argue that the district court erred in concluding that the $80 fee imposed on professional solicitors by § 173–b(1) does not violate the First Amendment as an unconstitutional tax and prior restraint on their protected expression. Appellants do not dispute that New York may impose a nominal registration fee under § 173–b(1) to defray the *administrative* expenses of the statute; rather, their position is that the district court erred in holding that the costs to the Attorney General's office of *enforcing* § 173–b(1) may be considered. We disagree.

■ It is well-settled that charitable solicitation involves a variety of speech interests protected by the First Amendment. *See Riley v. National Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 789, 108 S.Ct. 2667, 2673, 101 L.Ed.2d 669 (1988); *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 959–60, 104 S.Ct. 2839, 2848–49, 81 L.Ed.2d 786 (1984); *Village of Schaumburg v. Citizens for a Bet-*

---

2. Plaintiffs made two arguments against this conclusion. First, they attempted to re-argue the issue of whether enforcement costs could be considered. They argued that while "administrative enforcement" costs could be considered, "penal enforcement" costs could not. The court noted that in its earlier decision it was aware of the fact that the Charities Bureau had what plaintiffs termed "penal enforcement" powers when it decided that enforcement costs could be considered. *National Awareness II*, 848 F.Supp. at 512. It found plaintiffs' argument a rehash of their earlier arguments and declined to revisit

the issue. *Id.* Second, plaintiffs argued that it was unreasonable under the First Amendment to in effect charge law-abiding fundraisers with the costs of enforcing § 173–b(1), when the legislature gave both the OCR and the Charities Bureau the power to recover the costs of enforcement from wrongdoers. The court ruled that it did not believe that in order for a registration fee to pass constitutional muster, costs of administration and enforcement must be billed to fundraisers in proportion to the costs they caused the government to incur. *Id.* at 513.

*ter Environment,* 444 U.S. 620, 632–33, 100 S.Ct. 826, 833–34, 63 L.Ed.2d 73 (1980). "[I]t is equally clear that while the exercise of [c]onstitutionally protected activities may not be taxed, it may be regulated, provided the regulation is narrowly tailored to achieve a legitimate governmental interest, is content-neutral in terms and effect, and does not unduly burden speech." *Center for Auto Safety, Inc. v. Athey,* 37 F.3d 139, 144 (4th Cir.1994). Thus, fees that serve not as revenue taxes, but rather as means to meet the expenses incident to the administration of a regulation and to the maintenance of public order in the matter regulated are constitutionally permissible. *See Murdock v. Pennsylvania,* 319 U.S. 105, 113–14, 63 S.Ct. 870, 875, 87 L.Ed. 1292 (1943) (striking down a license tax that was "not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question"); *Cox v. New Hampshire,* 312 U.S. 569, 577, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941) (upholding a sliding scale licensing fee charged for parade permits because the fee was "not a revenue tax, but one to meet the expense incident to the administration of the [licensing statute] and to the maintenance of public order in the matter licensed") (internal quotations omitted); *Athey,* 37 F.3d at 145–46 (upholding a statute that required charities seeking to solicit in Maryland to pay an annual sliding scale fee based on the charity's nationwide level of public contributions, in part, because "the [s]tatute's sliding scale [was] narrowly tailored to match the costs incurred by Maryland in implementing the [s]tatute...."); *Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050, 1056 (2d Cir.1983) ("Licensing fees used to defray administrative expenses are permissible, but only to the extent necessary for that purpose."). *But see Forsyth County, Georgia v. Nationalist Movement,* —— U.S. ——, ——, 112 S.Ct. 2395, 2404, 120 L.Ed.2d 101 (1992) (ordinance requiring private groups demonstrating on public lands to pay a fee in an amount to be fixed by the County was found unconstitutional because the fee was based upon the County Administrator's discretionary assessment of the amount of hostility likely to be created by the speech based on its content).

In the present case, the parties have stipulated that the costs incurred by New York in administering and enforcing § 173–b(1) exceed the fees received under § 173–b(1) *only if* both the administrative costs incurred by OCR *and* the enforcement costs incurred by the Attorney General's office are considered. In *United States Labor Party v. Codd,* 527 F.2d 118, 119–20 (2d Cir.1975), we upheld a New York statute that imposed a $5 permit fee for the issuance of a daily permit to use sound amplification devices on a finding that "the administrative costs associated with the *enforcement* of the licensing ordinance far exceeded the five dollars charged for a permit." (Emphasis supplied). Thus, our Circuit has recognized that enforcement costs may be considered in assessing the constitutionality of a licensing fee under the First Amendment. *See also Athey,* 37 F.3d at 141, 145 (upholding a registration fee where the Secretary of State was vested with enforcement powers); *Streich v. Pennsylvania Comm'n on Charitable Orgs.,* 579 F.Supp. 172, 177 (M.D.Pa.1984) (upholding registration fees of $10, $25 or $100 for charitable organizations because "the fees imposed upon solicitation [were] clearly nominal and substantially related to the costs of supervising and policing the charities. The fees ... [were] set in a manner relative to the costs of enforcement."); *Torsoe Bros. Constr. Corp. v. Board of Trustees of the Inc. Village of Monroe,* 49 A.D.2d 461, 465, 375 N.Y.S.2d 612, 616–17 (2d Dep't 1975) ("It is well settled that where a license or permit fee is imposed under the power to regulate, the amount charged cannot be greater than a sum reasonably necessary to cover the costs of issuance, inspection and enforcement....").

Conceding that these cases specifically mention enforcement costs as a type of costs that may be included in a registration scheme, appellants nonetheless argue that the Attorney General's office is involved in bringing penal/quasi-criminal enforcement actions concerning fraud and misappropriation of funds under the charities laws generally, and that this is not the type of administrative enforcement anticipated under § 173–b(1). They distinguish what they term "ad-

ministrative enforcement" costs from "penal/quasi-criminal enforcement" costs, arguing that only the incidental administrative costs of defraying the expenses of § 173–b(1) itself are allowable.[3] They submit that the Charities Bureau has engaged in several civil actions in which it obtained injunctive relief and restitution, and that these actions fall well beyond simple inspections to determine compliance by professional solicitors with § 173–b(1). We are unpersuaded.

■ We do not agree with appellants that the $80 fee required by § 173–b(1) infringes the First Amendment simply because the revenues derived therefrom are not limited solely to the costs of administrative activities, such as processing and issuing fees. Nor do we believe that a distinction should be made herein between "administrative enforcement" costs and "penal/quasi-criminal enforcement" costs. Such distinctions misinterpret the purposes underlying registration requirements, which, according to New York caselaw, "regulate ... the operation of organizations which ... violate the law by failing to register or by engaging in what is tantamount to fraudulent solicitation." *Green v. Javits*, 1 A.D.2d 342, 344, 149 N.Y.S.2d 854, 856 (1st Dep't 1956); *see also Viguerie Co. v. Paterson*, 94 A.D.2d 672, 673, 462 N.Y.S.2d 669, 670 (1st Dep't 1983) ("The Secretary of State is charged by law with the enforcement of the provisions of Article 7–A ... in the exercise of the State's police power, to prevent fraud and safeguard the public welfare in respect to charitable solicitations...."), *aff'd*, 62 N.Y.2d 871, 478 N.Y.S.2d 864, 467 N.E.2d 528 (1984); *Abrams v. New York Found. for the Homeless, Inc.*, 148 Misc.2d 791, 562 N.Y.S.2d 325, 328 (Sup.Ct.1990) ("The Attorney General is clearly empowered to supervise charitable corporations and to enjoin them from soliciting funds improperly...."). A certain degree of enforcement power is necessary to ensure that the purposes of Article 7–A are served. We therefore agree with the district court that it is

permissible to include the costs of both administering and enforcing § 173–b(1) in determining the constitutionality of the registration fee. By this ruling we do not intend to hold, however, that enforcement costs may be so joined *simply because* they are in some manner related to the enforcement of Article 7–A. Rather, we hold that the propriety of inclusion of particular enforcement costs should be determined case-by-case. This being so, the narrow question we must decide herein is whether the district court's conclusion that the enforcement costs borne by the Charities Bureau in *this* case extended the constitutional boundaries too far.

Upon carefully reviewing the Joint Stipulation of Facts, we hold that the $80 fee imposed by § 173–b(1) is a nominal fee that serves the legitimate purpose of defraying the expenses incident to the administration and enforcement of § 173–b(1). *See, e.g., Murdock*, 319 U.S. at 113–14, 63 S.Ct. at 875–76; *Cox*, 312 U.S. at 577, 61 S.Ct. at 766; *Athey*, 37 F.3d at 145–46; *Powers*, 723 F.2d at 1056; *Codd*, 527 F.2d at 119–20. In recent years, the fees received by OCR from professional solicitors who register under § 173–b(1) range from approximately $100,000 to $140,000. The annual cost to the State of the Charities Bureau is approximately $3,000,000. Of that amount, approximately 5 percent of the Charities Bureau's resources, or around $150,000, is devoted to "actions, investigations, litigation, and compliance efforts" with respect to registered and delinquent professional solicitors pursuant to § 173–b(1). The costs borne by the Charities Bureau are reasonable, and, indeed, in comparison with its budget as a whole, may be characterized as minimal.

The stipulated record further supports the conclusion that there is an adequate link between the Charities Bureau's involvement in enforcement actions with respect to § 173–b(1), and the revenues collected thereunder. Under New York's statutory scheme, the

---

3. As an illustration of "administrative enforcement" costs, appellants state:

A hypothetical example of administrative enforcement in the instant case would be a request from [OCR] ... directed to a fundraiser asking him or her to identify each professional

solicitor utilized in a given campaign. The response could then be checked against OCR's registration records to ensure that each of the solicitors was registered pursuant to the challenged statute.

(Appellants' Br. at 28–29).

Attorney General's office is the only New York State agency authorized by Article 7–A to bring actions seeking injunctive relief; to issue subpoenas and take testimony; and to seek other court relief such as restitution, dissolution of a corporation, or an order directing the removal of any director or other person responsible for a violation of Article 7–A. *See* N.Y. Executive Law § 175. The stipulated record establishes that the enforcement efforts of the Attorney General's office have not overlapped or duplicated any administrative proceedings commenced by OCR. On the contrary, the two agencies keep each other advised of the court actions filed by the Attorney General's office and of the administrative proceedings commenced by OCR in order to avoid overlap or duplication. Indeed, unregistered or delinquent organizations or individuals are referred to the Charities Bureau by OCR when OCR's efforts to secure statutory compliance have proven unsuccessful and litigation appears appropriate. We do not view this involvement in civil enforcement actions by the Attorney General's office, which is limited in scope to enforcement of Article 7–A itself, as constitutionally impermissible.

■ In sum, we conclude that the $80 fee imposed by § 173–b(1) is a nominal fee that serves the legitimate purpose of defraying the expenses incident to the administration and enforcement of § 173–b(1). There is a sufficient link between the Attorney General's enforcement activities with respect to § 173–b(1), and the revenues collected thereunder to satisfy this Court that appellants' First Amendment rights have not been impermissibly infringed. Furthermore, § 173–b(1) is narrowly tailored to accomplish the legitimate governmental interest in regulating charitable solicitations by professional solicitors in New York. The $80 fee is statutorily set, and New York is afforded no discretion in imposing the fee based on speech content. Further, all professional solicitors seeking to solicit contributions in New York are charged the fee, without regard to the nature of the cause espoused. We conclude that the $80 registration fee imposed by § 173–b(1) does not violate the First Amendment.

**B.** *Equal Protection*

■ Appellants further appeal the district court's ruling that § 173–b(1) is not unconstitutional under the Equal Protection Clause. They argue that § 173–b(1) discriminates against them on the basis of the content of their speech or based upon the nature of their employment, since it distinguishes between professional solicitors in the employ of professional fundraisers who must pay the fee, and officers, volunteers and employees of charitable organizations or fundraising counsel who are excluded from the definition of "professional fundraisers" and therefore are not subject to the fee. *See* N.Y. Executive Law § 171–a(4). We disagree.

While the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985), the Supreme Court has clarified that "[e]qual protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purposes for which the classification is made." *Baxstrom v. Herold*, 383 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620 (1966); *accord Walters v. City of St. Louis*, 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660 (1954); *Fetterusso v. State of New York*, 898 F.2d 322, 325 (2d Cir.1990). Further, the "Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972).

We conclude that § 173–b(1) does not impermissibly discriminate against appellants with respect to either the content of their speech or based on the identity of their employer. Article 7–A sets forth comprehensive registration requirements for charitable organizations, professional fundraisers and professional solicitors seeking to engage in fundraising activities in New York. Under the statutory scheme, all professional solicitors not working in-house for a charitable organization are charged the $80 fee,

without regard to their viewpoints. Moreover, all charitable organizations soliciting in New York are required to register with the State and to pay registration fees. Section 173–b(1) is designed to regulate independent professional solicitors who are not otherwise regulated. We view the distinction as directly and substantially related to the purposes of Article 7–A. *See, e.g., Streich,* 579 F.Supp. at 179–80 (provision of charities act allowing exclusion of different classes of charitable organizations, most of which were regulated by other state laws or which did not hire professional solicitors, did not deny equal protection to regulated charities). Accordingly, we hold that § 173–b(1) does not violate the Equal Protection Clause.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court dismissing appellants' complaint.

