**CHICAGO ACORN, SEIU Local No. 880, and Ted Thomas, Plaintiffs–Appellees, Cross–Appellants,**

v.

**METROPOLITAN PIER AND EXPOSITION AUTHORITY, Defendant–Appellant, Cross–Appellee.**

Nos. 98–1939, 98–1977.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1998.

Decided July 21, 1998.

Paul Strauss (argued), Miner, Barnhill. & Galland, Chicago, IL, for Plaintiffs–Appellees.

Michele Odorizzi (argued), Mayer, Brown & Platt, Renee Benjamin, Metropolitan Pier and Exposition Authority, Chicago, IL, for Metropolitan Pier & Exposition Authority.

Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.

POSNER, Chief Judge.

We have an appeal and a cross-appeal from an injunction that restricts the right of the Metropolitan Pier and Exposition Authority (MPEA)—the Illinois governmental unit that owns Navy Pier in Chicago—to limit the exercise of free speech by people who frequent the pier. The plaintiffs want to engage in a range of expressive activities there—leafletting, soliciting signatures on petitions, carrying signs and banners, wearing clothing festooned with symbols and slo-

gans, chanting, speechifying—all to the end of advocating an increase in the minimum wage. They wanted to do these things during the Democratic National Convention in 1996, when the MPEA rented the entire pier to the Democrats for $1 for a party, and they were turned away, and brought this suit.

Navy Pier, in downtown Chicago, juts out 3,000 feet into Lake Michigan and is more than 400 feet wide at its widest point. Formerly a naval facility, by the 1980s it was little used and in 1989 the Illinois legislature handed it over to the MPEA (at the time known as the Metropolitan *Fair* and Exposition Authority) and appropriated $200 million for the pier's renovation. The pier was to be transformed into a recreational and commercial center—part park, part meeting and exhibition facility, part shopping emporium, part amusement park. The reconstruction was completed in 1995.

The stylized map at the end of this opinion will give the reader a rough sense of the pier's current design. For our purposes, the design has four elements. The first consists of outdoor strolling areas, mainly sidewalks. The principal sidewalk—the pier's thoroughfare—is Dock Street (misnamed—it is not a street; except for parking, the pier is closed to vehicles other than service vehicles). It runs the length of the pier on its south side. It is broad, abuts the lake, and is more like a boardwalk than a conventional sidewalk. Tourist boats are moored on the lake side of the street, and the other side is lined with shops (the Arcade Shops) and restaurants. Dock Street ends, at the eastern end of the pier, in a plaza in which sculpture is sometimes exhibited. There is a sidewalk on the north side of the pier as well, between the lake and the service street, but it is narrow and little used. The district court treated what we are calling the first design element as a traditional public forum, which means (as we shall see) that the MPEA must open it up to the full range of First Amendment expressive activities, subject however to reasonable restrictions as to the time, place, and manner of expression.

The second design element is a tiny amusement park, consisting of a ferris wheel, carousel, reflecting pool, and small indoor park, called Crystal Gardens, which has fountains that squirt columns of water to each other, surmounted by a glass dome. The second element, too, the district judge deemed a traditional public forum. The third element, consisting mainly of the Family Pavilion at the western end of the pier and the Arcade Shops, which lead off from the Family Pavilion, is an indoor shopping mall. The district judge treated this as a nonpublic forum in which the plaintiffs have no right to engage in expressive activity. The fourth element, which includes the Grand Ballroom and Festival Hall, consists of large meeting rooms suitable for trade and other conventions (such as the trade association of candy manufacturers, which held its annual convention recently in Festival Hall), weddings and other parties (in the Grand Ballroom), and exhibitions (for example the annual Chicago Art Fair, which is also held in the Grand Ballroom). The fourth element the district judge held was a designated public forum, which she equated to a traditional public forum.

The sidewalk, park, and mall sections of the pier are open to the public without charge, except that they are closed from 2 a.m. to 6 a.m., the same hours that the parks owned by the Chicago Park District are closed. The MPEA's suggestion that only a facility that is open 24 hours a day can be classified as a public forum for First Amendment purposes does not merit discussion.

The injunction entered by the district court (and in this court challenged by both sides) gives the plaintiffs no rights in the indoor shopping mall but full First Amendment rights in the rest of the pier, though subject to reasonable time, place, and manner restrictions.

All the buildings on the pier, as well as the pier itself, are owned by the MPEA; and because the legislature has appropriated no operating funds for the pier, the MPEA must defray the cost of running the pier out of the lease rentals that it receives from the shops and other concessions and the fees that it receives for renting out the meeting rooms. Since Navy Pier is, thus, essentially a commercial enterprise, the MPEA is naturally highly sensitive to the spillover effects,

whether positive or negative, of each activity on the pier on every other activity on the pier. The positive effects are illustrated by the MPEA's sponsorship of fireworks displays for which there is no charge. The displays are a form of advertising; they publicize the pier and attract people who buy goods or services from the shops and restaurants on the pier. So while the displays generate no revenue directly, their cost is recouped in the greater sales that they generate for the MPEA's lessees. The act of largesse that set off this suit—the rental of the entire pier to the Democratic Party for $1—was motivated, we are assured by the MPEA, not by any fealty to the Democrats but by the enormous and on the whole favorable publicity that the event was expected to generate for the pier. When we asked the MPEA's lawyer at argument whether her client would rent the pier to the American Nazi Party for $1, we received an emphatic negative answer; there would be enormous publicity, but of the wrong kind. The MPEA refuses to waive fees for the plaintiffs, who like to hold a rally in the Grand Ballroom in support of their proposal for a higher minimum wage.

 If the MPEA were a private entity, it would have a free hand in deciding whom to admit to its property and on what terms, provided that it did not violate certain anti-discrimination laws that are of no moment to this suit. The pier if privately owned would not fall within the "company town" exception of *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), to the rule that the First Amendment constrains only governmental action; it is not a town. *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); compare *Petersen v. Talisman Sugar Corp.,* 478 F.2d 73, 82 (5th Cir.1972). But it is publicly owned, and so its owner, the MPEA, is subject to the First Amendment and as a result its discretion is curtailed. Clearly, it is not permitted to pick and choose among the users of its facilities on political grounds: to waive fees for the Democratic Party because the mayor of Chicago is a Democrat and wanted to avoid in 1996 any repetition of the disastrous events that attended the 1968 Democratic National Convention, the last to be held in Chicago,

but not to waive fees for Chicago Acorn and the other plaintiffs because the mayor opposes the increase in the minimum wage that they advocate. *Arkansas Educational Television Comm'n v. Forbes,* —— U.S. ——, ——, 118 S.Ct. 1633, 1640, 140 L.Ed.2d 875 (1998); *Rosenberger v. Rector,* 515 U.S. 819, 828–29, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *May v. Evansville–Vanderburgh School Corp.,* 787 F.2d 1105, 1113 (7th Cir. 1986). The MPEA denies that its decisions are politically motivated, and the record contains no direct evidence that they are. There is favoritism for events associated with Chicago's mayor, who is a Democrat; but the MPEA contends that the motivation for this favoritism is purely economic; its policy is to waive fees for users who will generate large favorable publicity. A policy so motivated is likely, however, to favor the political establishment. As applied to *political* applicants for fee waivers, a favorable-publicity criterion is especially likely to have political consequences, since the only political users of the pier who will generate large amounts of favorable publicity are respectable, popular politicians and respected, well-established political groups; pariahs need not apply.

 We doubt that the MPEA has to allow its meeting rooms to be used for political events at all, for we disagree with the district judge's ruling that these rooms constitute a public forum. Unlike public streets or the speakers' corner in London's Hyde Park, the exhibition, convention, and meeting facilities of Navy Pier are not traditional sites for public assembly, demonstrations, or debate. They thus are not what in the jargon of free-speech law are called "traditional public forums." *United States v. Grace,* 461 U.S. 171, 179–80, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Nor are they nontraditional such sites (that is, not public streets, public sidewalks, or public parks) which the government by throwing open to the public for a range of expressive purposes has dedicated as a public forum ("designated public forums," *id.*), though unlike traditional public forums the dedication of a designated public forum to the public

can be revoked, *id.* at 46, 103 S.Ct. 948, and its subject-matter can be limited in accordance with the character of the forum. *City of Madison Joint School District No. 8 v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 175 n. 8, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976); see, e.g., *Widmar v. Vincent,* 454 U.S. 263, 267–68 and n. 5, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (university facilities held to be public forum for students but not nonstudents); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (publicly owned theater held permissibly limited to theatrical performances); *Piarowski v. Illinois Community College Dist. 515,* 759 F.2d 625, 628–29 (7th Cir.1985) (public college's exhibition area limited to members of college community); *Church on the Rock v. City of Albuquerque,* 84 F.3d 1273, 1278 (10th Cir. 1996) (senior citizens' center open to the public but only for discussion of subjects of interest to the elderly). The meeting facilities at Navy Pier fall into the residual category of "nonpublic forums." *Perry Education Ass'n v. Perry Local Educators' Ass'n, supra,* 460 U.S. at 46, 103 S.Ct. 948. These are facilities that are not open to the general public although they are sites usable and sometimes used for discussion and other expressive activities. See *May v. Evansville–Vanderburgh School Corp., supra,* 787 F.2d at 1113.

Navy Pier's meeting rooms are rented to organizations for use by their members and guests rather than by the public at large unless the lessee decides to admit the public. In deciding whom to rent to and at what price, the MPEA seeks to maximize positive spillovers and minimize negative ones, since as we have said the spillovers affect the MPEA's revenues from its other customers. It's not as if the MPEA owned a theater at which any member of the public was welcome who could pay the admission price, as in the *Southeastern Promotions* case. Selectivity and restriction are of the essence of the commercial strategy that informs the MPEA's management of the pier. Cf. *Lehman v. City of Shaker Heights,* 418 U.S. 298, 303–04, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). These features mark it as a nonpublic facility within the meaning of the First Amendment precedents. See, e.g., *Arkansas Educational Television Comm'n v. Forbes, supra,* 118 S.Ct. at 1642; *Cornelius v. NAACP Legal Defense & Educational Fund,* 473 U.S. 788, 799–806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

The MPEA could, therefore, as the *Lehman* and *Cornelius* cases make clear, adopt a blanket rule barring the use of its meeting rooms for political events, if it reasonably believed that such events, because of their controversiality, would drive customers from the pier and reduce the MPEA's revenues. Government is not required to subsidize the market in ideas and opinions by throwing open its nonpublic meeting facilities to politicians. And by the same token, if it does allow such facilities to be used for such events, it does not have to waive its normal fee just because a particular applicant can't afford the fee; that is, it does not have to subsidize marginal or unpopular political causes. The recent *Forbes* case makes this clear (more on *Forbes* shortly), as do *Stonewall Union v. City of Columbus,* 931 F.2d 1130, 1137–38 (6th Cir.1991), and the cases which hold that government is not required to exempt expressive activities from general taxes, e.g., *Leathers v. Medlock,* 499 U.S. 439, 447–48, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991); *Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 545–46, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Cammarano v. United States,* 358 U.S. 498, 513, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), and nondiscriminatory fees. *Cox v. New Hampshire,* 312 U.S. 569, 577, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); *Northeast Ohio Coalition for the Homeless v. City of Cleveland,* 105 F.3d 1107, 1109–10 (6th Cir.1997); *National Awareness Foundation v. Abrams,* 50 F.3d 1159, 1165 (2d Cir.1995). What the MPEA may not do is to employ political criteria to decide who may use its facilities and on what terms, even if they are not public forums in even the most limited sense. *Cornelius v. NAACP Legal Defense & Educational Fund, supra,* 473 U.S. at 806, 105 S.Ct. 3439; *Grossbaum v. Indianapolis–Marion County Building Authority,* 63 F.3d 581, 587 (7th Cir.1995); cf. *Police Department v. Mosley,* 408 U.S.

92, 95–96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

 It is only a small step to the conclusion that the MPEA may not discriminate in the terms of access to these facilities in favor of established parties and popular politicians on the ground that, being established, being popular, they generate favorable publicity. Such a policy would be a form of the heckler's veto; it would be the equivalent of charging a higher permit fee for a march or other demonstration by an unpopular group on the ground that the onlookers are likely to be hostile, thus necessitating increased security; and that is forbidden. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133–35, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), and cases cited there. The motive is innocent, but the discriminatory effect too great to be permitted. Although the principle barring discrimination in favor of popular politicians may make it more difficult for the MPEA to maximize its profits from the management of Navy Pier (which is why its motive may indeed be innocently commercial rather than invidiously political), nowhere is it written that government, when it embarks on essentially commercial ventures, is entitled to the same freedom of action as private venturers. It is not as if the ownership of shopping malls and convention centers were at the core of the American concept of government.

At argument the MPEA pressed on us the Supreme Court's recent decision in *Arkansas Educational Television Commission v. Forbes, supra*, which holds that a publicly owned television station may use "editorial discretion" to exclude an independent candidate who has little public support from a debate among the candidates for a public office. *Forbes* might be read to endorse the same form of heckler's veto to which the MPEA is appealing in this case. But to read *Forbes* so broadly would be to place it on a collision course with *Forsyth*, which *Forbes* did not even cite and we doubt meant to overrule. A debate cannot be staged without deciding who may participate in it, and given the inescapable need to choose, the criterion of choice that the television station used was as good as any. Speech values were on both

sides of the equation in *Forbes*. If, to avoid restricting speech, the station invited all the candidates to participate in the debate, the time available to the frontrunners would be curtailed, yet what frontrunners have to say is probably more valuable to the audience than what the fringe candidates have to say—probably, not certainly. Major parties can originate as fringe parties, and fringe parties can contribute ideas that are later picked up by major parties. Still, restricting the speech opportunity of the fringe candidates may increase the speech benefits of the debate overall. No such necessity of making tradeoffs faced the MPEA when asked to waive fees for the plaintiffs, having done so for the Democrats. It's not as if the plaintiffs had wanted to crash the Democrats' party, in the way that *Forbes* wanted to crash the debate of the frontrunners.

 *Forbes* may, however, rest on a broader ground. Whenever the government is in the business of speech, whether it is producing television programs or operating a museum or making grants or running schools, the exercise of editorial judgment is inescapable. If there is any political or ideological resonance to the expressive activity involved, the good-faith exercise of that judgment may have unavoidable political or ideological consequences; and so (because they are unavoidable) these consequences do not condemn the judgment. See, e.g., *National Endowment for the Arts v. Finley*, —— U.S. ——, 118 S.Ct. 2168, 2177–80, 141 L.Ed.2d 500 (1998). A publicly owned art gallery, which has to decide which pictures to hang where, is not constitutionally debarred from placing the most offensive pictures in the least conspicuous exhibition area. *Piarowski v. Illinois Community College Dist. 515, supra*, 759 F.2d at 630–31. But Navy Pier is not a producer of speech; it is a renter of premises to speakers. It need not make *any* editorial judgments about the content of the speech in its meeting rooms, any more than the telecommunications carriers that transmitted the television debate in the *Forbes* case to viewers' homes had to exercise an editorial judgment about the debate.

 What we have said so far shows that the district judge was right to require the

MPEA to formulate criteria for the renting out of the Grand Ballroom and other meeting facilities that will prevent the direct or indirect use of politics to determine whether to waive the normal fees. If the MPEA waives fees for one political group, it must waive fees for other political groups, without favoritism.

We must next decide whether the district judge was also right to classify the sidewalks, the plaza, and Crystal Gardens as traditional public forums. *Capitol Square Review & Advisory Board v. Pinette*, 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995); *Perry Education Ass'n v. Perry Local Educators' Ass'n, supra,* 460 U.S. at 45, 103 S.Ct. 948; *Grossbaum v. Indianapolis–Marion County Building Authority,* 100 F.3d 1287, 1296–97 (7th Cir.1996). Clearly these are not *designated* public forums. The MPEA has not thrown them open for assembly, debate, demonstrations, or other forms of mass expressive activity. They are not traditional public forums either. The sidewalks are not through routes; they lead only to the pier facilities themselves. The plaintiffs' lawyer told us at argument that the sidewalks contain bike lanes that are part of a bike path that runs along the Chicago lakefront from far to the south of the pier to far to the north of it. This is not accurate. There are no bike lanes on the pier, though some bicycling is permitted; the lakefront bike path crosses the base of the pier rather than running into it. Rather than being part of the city's automotive, pedestrian, or bicyclists' transportation grid, the sidewalks on the pier and the service street on its north side are internal to the pier, like the sidewalks, streets, and parking lots in Disney World or McCormick Place (Chicago's major convention center, also owned by the MPEA). Cf. *United States v. Kokinda,* 497 U.S. 720, 727, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion). The pier itself is a discrete, outlying segment or projection of Chicago rather than a right of way. It is its own little world of delights and in this respect it is something like a major airport, which the Supreme Court in *International Society for Krishna Consciousness, Inc. v. Lee (ISKCON),* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), refused to classify as a public forum. A major airport is both a transportation facility and a shopping mall; Navy Pier is an amusement park and a meeting and entertainment center. Whatever one calls such a complex—there doesn't seem to be a compendious term for it—neither it nor the concourses within it are a public forum as the cases use the term. Navy Pier's being classified as a public forum is also not indispensable to the health of the market in ideas and opinions; there are plenty of other areas in Chicago for demonstrations in support of a higher minimum wage or other political objectives.

Yet while holding that the airport was not a traditional public forum, the Court also held that the Krishnas were entitled to hand out leaflets in the public areas of the airport. See *International Society for Krishna Consciousness, Inc. v. Lee, supra,* 505 U.S. at 689–93, 112 S.Ct. 2701 (O'Connor, J., concurring); *Lee v. International Society for Krishna Consciousness, Inc.,* 505 U.S. 830, 112 S.Ct. 2709, 120 L.Ed.2d 669 (1992) (per curiam). Actually, this was only Justice O'Connor's view; but it is the lowest common denominator of the Court's fractured decisions invalidating the airport authority's ban on leafletting while upholding its ban on soliciting and is therefore the holding that binds us. The holding is decisive in favor of so much of the district judge's order as commands the MPEA to rescind its ban against leafletting on the sidewalks and in the other open areas. But it is equally decisive against any suggestion that the plaintiffs have a right to picket, stage marches, hold demonstrations, wave posters, shout through bullhorns or public-address systems, solicit passersby for money or signatures, or harangue them from soapboxes, as they could do (subject of course to reasonable restrictions) on Michigan Avenue, on the plaza outside the Daley Center, on the sidewalks outside the federal courthouse on Dearborn Avenue, or at the other familiar Chicago sites for political expression. Because the MPEA owns the buildings on Navy Pier and depends for the upkeep of the pier on the commercial revenues that those buildings generate, it has a legitimate and substantial interest in preventing activities that could kill those reve-

nues. It has a greater interest than the City of Chicago itself has in the prosperity of the shops along State Street. Even that interest is not negligible, because the amount of tax that the City can extract from merchants and their customers depends on the merchants' revenues. But it is a lesser interest than the MPEA's corresponding interest in the commercial health of Navy Pier and therefore it does not justify equivalent restrictions on political expression. This may be *why* State Street is a traditional public forum and Navy Pier is not.

Not only are the costs of intrusive, noisy, or menacing demonstrations greater on Navy Pier than on State Street, but the benefits in dissemination of ideas and opinions are less because of the geography of the pier. It is rather out of the way, and is so configured that everyone entering it either on foot or by car must enter through a narrow bottleneck, appropriately named Gateway Park, which the MPEA also controls and which it concedes is a traditional public forum. By demonstrating in Gateway Park, persons wishing to exercise their First Amendment right of expression can communicate with every single person who enters Navy Pier. Cf. *International Society for Krishna Consciousness, Inc. v. Lee, supra,* 505 U.S. at 684–85, 112 S.Ct. 2701 (O'Connor, J., concurring). The plaintiffs complain that the MPEA has confined expressive activities in Gateway Park to a tiny, almost invisible corner; if so, this may be an independent violation of the First Amendment, but that issue is not before us.

We do not quite know, and need not at this stage of the litigation decide, just how broadly or narrowly the right of leafletting carved in *ISKCON* should be interpreted in the setting of Navy Pier. What is particularly interesting about Justice O'Connor's swing opinion is that it blurs the line between the public and nonpublic forum, suggesting a sliding-scale approach—a standard versus a rule or categories—in which the benefits and costs of free speech are balanced in particular settings. See also *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 650–51, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). Between marches, bullhorns, soliciting, and the like, on the one hand, and leafletting on the other may be forms of advocacy that would not interfere with the commercial objectives of the MPEA. The plaintiffs are perfectly free to wear T-shirts, hats, and other articles of clothing on which they display slogans or symbols, provided the slogans are not obscene. If the plaintiffs wanted to hand out T-shirts that display their message, cf. *Ayres v. City of Chicago,* 125 F.3d 1010 (7th Cir.1997), this wouldn't be any more disruptive than handing out leaflets, and indeed the T-shirt could be considered a leaflet in another medium—cloth rather than paper. But as we are vacating the part of the injunction relating to the open areas of the pier because they are not traditional public forums, it would be premature for us to try to decide exactly what restrictions the MPEA can be permitted to impose on the use of them for political expression.

 We come last to the plaintiffs' cross-appeal, which attacks the district judge's ruling that the indoor mall areas of Navy Pier are nonpublic forums so that the MPEA is free to exclude all expressive activity from them. If, to repeat an earlier point, these were private shopping malls, the owner could impose such a ban; and this would be equally true of O'Hare Airport if it were privately owned. But as Navy Pier is publicly owned, it seems to us to come within the rule of the *ISKCON* case, and leafletting must be allowed, just as the First Circuit held, in reliance on *ISKCON,* with reference to the Boston subway in *Jews for Jesus, Inc. v. Massachusetts Bay Transportation Authority,* 984 F.2d 1319, 1324–25 (1st Cir. 1993). There is no relevant difference between the sidewalks on Navy Pier and the public areas of the indoor shopping malls. Both types of pathway are pedestrian walkways leading mainly to shops. The fact that one type has a roof over it and the other does not cannot make as large a difference as the district judge (who, remember, classified the sidewalks as a traditional public forum and the interior walkways as a totally nonpublic forum) thought. What is true is that some of the interior walkways are rather narrow, compared to Dock Street. The plaintiffs should not be permitted to hand

out leaflets in places where pedestrian traffic will be obstructed.

To summarize, although we agree with the district judge that the MPEA has violated the First Amendment rights of these plaintiffs and should be enjoined, we think that the injunction that she entered must be vacated. It is at once too broad in treating the open areas, the amusement park, and the meeting rooms as public forums, and too narrow in denying *ISKCON* status to the interior walkways. But it is correct in requiring that fee waivers for the meeting rooms not be granted on discriminatory terms, though this is not because, as the district judge believed, the rooms are public forums; they are not; but government may not discriminate on political grounds in the terms of access to the nonpublic forums that it owns. The case must be remanded for the drafting and entry of a new injunction in conformity with the analysis in this opinion.

We are guardedly optimistic that on remand the parties will be able to agree on an appropriate injunction, for we sensed by the close of the oral argument that they are not as far apart as their briefs had suggested. We doubt that the plaintiffs want to destroy the amenities or impair the commercial viability of Navy Pier. What good would it do them? It would accelerate what is now a nationwide trend toward the privatization of public property. If the First Amendment handcuffs the effective exploitation of commercially valuable public property, the government will have an incentive to sell it to a private company, which will not be cabined by the First Amendment. We doubt that a private owner of Navy Pier would allow the plaintiffs even the limited rights of expression that we hold the Constitution entitles them to engage in there.

We wish in closing to commend the counsel for both parties for their excellent briefs and oral arguments.

VACATED AND REMANDED WITH INSTRUCTIONS.

# Navy Pier Major Components

(Parking 1st level on north side of Pier)

**PIER PARK**
■ Ferris wheel
■ Carousel
■ Reflecting pond / ice skating rink

④

**SKYLINE STAGE** ⑤

**ARCADE SHOPS** ⑥

**GRAND STAIRCASE** ⑦

**FESTIVAL HALL**
■ Exposition space
■ Meeting rooms

⑧

**BEER GARDEN** ⑨

**GRAND BALLROOM** ⑩

**PARKING**
■ 1,150 enclosed spaces

⑪

**FAMILY PAVILION**
■ Restaurants
■ Shops
■ IMAX® Theater
■ Chicago Children's Museum

①

**CRYSTAL GARDENS** ②

**DOCK STREET**
■ Tour boats
■ Entertainment stages
■ Retail carts (seasonal)

③