Vito GASPARO, Harvey Kedansky, Louis Reid, Adam Petrella, and Katherine Ashley, Plaintiffs,

v.

CITY OF NEW YORK; Department of Transportation, City of New York; Richard Malchow, Acting Commissioner, Department of Transportation, City of New York; Department of Consumer Affairs, City of New York, Defendants.

No. 98–CV–3168 (ARR).

United States District Court, E.D. New York.

May 28, 1998.

Richard D. Emery, Emery, Celli, Cuti & Brinckerhoff, LLP, New York City, for Plaintiffs.

Sherill Kurland, Office of the Corporation Counsel, New York City, for Defendants.

*OPINION AND ORDER*

ROSS, District Judge.

Plaintiffs in this action are all owners and operators of newsstands in New York City ("City"). They seek to enjoin the implementation of Local Law 29, an ordinance passed by the City Council in 1997 creating a new concession scheme for newsstands located in the City. The concession scheme replaces a licensing scheme that had previously governed the operation of newsstands throughout the City. In seeking a preliminary injunction against the enforcement of that law, plaintiffs claim that the plan violates their rights under the First and Fourteenth Amendments. They argue that the plan gives City officials "unfettered discretion" to administer the concession program in violation of First Amendment standards, and that the increased permit fees represent an unconstitutional tax on the exercise of First Amendment rights. In addition, plaintiffs argue that because the plan pertains only to newsstand vendors and does not subject other kinds of sidewalk vendors to its strictures, it violates the Equal Protection Clause of the Fourteenth Amendment. For the reasons that follow, the court concludes that it has no jurisdiction to consider plaintiffs' claims regarding the increased permit fee. Insofar as the plan gives "unfettered discretion" to licensing officials to terminate a permit, the motion is granted. The motion is denied in all other respects.

## FACTS

The Department of Consumer Affairs ("DCA") administered the previous newsstand licensing system. Under that system, a person who wished to build a new newsstand or operate an existing newsstand was required to secure a permit from DCA. The permit was valid for two years with an annual fee of $538. *See* N.Y.C.Admin.Code § 20–230 (1991). The licensing scheme regulated the size and location of newsstands, provided that no new newsstand could be erected without the approval of the Department of Transportation ("DOT") and the Art Commission, *id.* § 20–231, and gave the Commissioner of DCA the authority, *inter alia,* to terminate or to revoke any license if the licensee violated any law or regulation related to the operation of the newsstand, *see id.* § 20–104e(1) (1986).

In August of 1994, Mayor Rudolph Guiliani announced the formation of an inter-agency task force to "develop a master plan to reduce the congestion of sidewalk obstructions and better regulate the streetscape of New York City." Emery Decl.Ex. A (Press Release, dated Aug. 18, 1994). The task force produced the "Coordinated Street Furniture Franchise Proposal." Under the proposal, to be implemented by DOT, the City would award a single franchise for the design, construction, installation, and maintenance of what the task force referred to as "street furniture"—various public structures, such as newsstands, bus stop shelters, and public toilets. The value of the franchise, which would be awarded by competitive bid, would derive from the franchisee's right to sell the advertising space on the street furniture.

In accordance with the Coordinated Street Furniture Franchise: Proposal, on April 30, 1997, the City Council enacted Local Law 29, which became effective on May 16, 1997. Local Law 29 created a concession scheme for newsstands to be administered by DOT in place of the old licensing scheme administered by DCA. The new law provided that future newsstand concessions would be distributed subject to the competitive bidding procedures used to allocate most substantial City concessions. Cummins Decl.Ex. B (Local Law, at 1). Vendors who were then operating newsstands pursuant to a DCA license could obtain concessions without competitive bidding. Specifically, Local Law 29 stated that:

> [C]urrent newsstand operators who have built and operated newsstands under the current licensing law should not, at least at this time, be put into this competitive system. However, there should be a moratorium on the issuance of newsstand licenses by the Department of Consumer Affairs and the City should receive revenues for the use of its sidewalks by newsstands. Therefore, pursuant to a determination made by the Department of Transportation regarding a particular newsstand location, persons who are newsstand licensees as of the effective date of this local law will be given the opportunity to become concessionaires at the site of the newsstands they have already built.

See Cummins Decl.Ex. B (Local Law 29, at 2). The special concession agreements extended to these existing newsstand operators, however, will remain valid for only five years. After that, the City will review the effectiveness of the concession program and either extend the program, propose a new arrangement, or revert to the previous licensing system. Id.

Following passage of Local Law 29, concession agreements for currently licensed newsstand operators were developed by the appropriate City authorities. Cummins Decl. Exs. C–F. The newsstand operators were informed that under the concession agreements, annual "occupancy charges" would be increased from the previous flat license fee of $538, to a range of $2,500 to $5,000, depend-ing on the location of the newsstand, and that newsstands would be replaced at no cost to them. Id. Ex. G. The newsstand operators were also informed that, pursuant to the new plan, all current newsstand licenses would he terminated on December 31, 1997. Id. Ex. I. In order to continue operating a newsstand after that date, vendors would have to sign a concession agreement with DOT.

In January of 1998, however, the City apparently began to reconsider whether the Coordinated Street Furniture Franchise Proposal should be implemented. To date, no franchisee has been selected by the City to assume the duties contemplated in the original proposal. Nonetheless, the City has proceeded to implement Local Law 29. On April 7, 1998 the City mailed the occupancy permit agreements to newsstand operators. Id. Ex. K. These permit agreements included some significant amendments from a draft version that had been circulated the previous August. First, the agreement was amended to reflect the fact that the viability of the street furniture franchise program was in doubt. Thus, the promise that newsstand vendors would receive new structures was modified with conditional language to reflect the program's uncertain status. Second, a provision was added to the agreement whereby the newsstand vendor had to agree to abide by the terms of the City's recently enacted adult establishment zoning law. See Text Amendment N950384ZRY to the Zoning Resolutions of the City of New York ("Zoning Amendment"). The amended agreement contained a clause stipulating that "[t]he Permittee shall not operate the newsstand as 'an adult bookstore,' as such is defined in Appendix A annexed hereto." See Cummins Decl. Ex. N (Summary of Changes to Newsstand Occupancy Permit). The "adult bookstore" clause places strict limits on the amount of sexually explicit literature that can be sold at a newsstand. In order to avoid application of the adult establishment zoning law, no more than 25% of display space may be occupied by "adult" materials, and no more than 40% of sales may consist of such materials. According to a deputy mayor of the City, the purpose of this amendment to the agreement is to "eliminate any issue that may exist concerning application of

the adult use zoning law to street newsstands," so that newsstand vendors do not take advantage of any loophole in the zoning law by seeking to specialize in the sale of adult magazines from their stands. *See* Emery Decl .Ex. N (Letter from Deputy Mayor Randy Mastro to Robert S. Bookman, dated April 14, 1998).

Along with the occupancy permit agreements mailed on April 7, newsstand operators were informed that they must sign the permit agreement and pay their "occupancy charge" by April 18 or forfeit their right to "operate the Existing Newsstand on the city streets." Emery Decl.Ex. L. The deadline was subsequently extended until April 26.

On the eve of the compliance deadline, April 25, 1998, plaintiffs petitioned this court for a temporary restraining order ("TRO") and a preliminary injunction against the City's enforcement of the new concession scheme, arguing that the scheme violates their constitutional rights under the First and Fourteenth Amendments. Specifically, plaintiffs argued that (1) Local Law 29 grants "unfettered discretion" to licensing officials and is therefore unconstitutional, (2) the occupancy charge imposes an unconstitutional tax on the exercise of First Amendment rights, and (3) the scheme violates the equal protection clause. Plaintiffs also challenged the inclusion of the adult bookstore clause in the occupancy permit, but have agreed to withdraw the claim at this time.[1]

Following discussions between the parties, the City agreed to extend the compliance until the matter could be briefed by the parties and a decision rendered by the court.

## DISCUSSION

### I. Preliminary Injunction Standard

■■■ A plaintiff who seeks to obtain a preliminary injunction based on alleged violations of First Amendment rights must demonstrate, first, that he or she is likely to suffer irreparable harm if the allegations are correct, and second, that there is a likelihood of prevailing on the merits of the action. *See Bery v. City of New York*, 97 F.3d 689 (2d Cir.1996). The first part of the test is necessarily satisfied in a First Amendment challenge, since " '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Hsu v. Roslyn Union Free School District*, 85 F.3d 839, 853 (2d Cir.1996) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)); *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir.1996). In order to satisfy the second part of the test,

> [o]rdinarily, the movant then has two options: it must either demonstrate a likelihood of success on the merits or it must raise "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." However, in a case in which "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.

*Bery*, 97 F.3d at 693 (citations omitted). Since plaintiffs' action here challenges a government action taken in the public interest pursuant to a statutory or regulator scheme, the higher standard applies. Thus, the court will grant plaintiffs' motion for an injunction only if plaintiffs can show a likelihood of success on the merits.

### II. Is Selling Newspapers from Newsstands Erected on City Sidewalks a Protected Activity Under the First Amendment?

Plaintiffs' constitutional claims are premised on the assumption that the operation of

---

**1.** The Zoning Amendment has been the subject of numerous legal challenges, *see, e.g., Buzzetti v. City of New York*, No. 96–7764, 1997 WL 164284 (S.D.N.Y. April 8, 1997), *aff'd*, No. 97–7585, 1998 WL 130866 (2d Cir. March 20, 1998). *Hickerson v. City of New York*, 997 F.Supp. 418 (S.D.N.Y. 1998). Because the Second Circuit recently stayed implementation of the law pending resolution of the most recent challenge, *Amsterdam Video, Inc. et al. v. City of New York*, No. 98–7270 (filed Apr. 9, 1998) (consolidated with *Hickerson, supra*), plaintiffs have agreed to withdraw their legal claims based on this provision of the occupancy permits at this time. Those claims are subject to renewal upon the Second Circuit's ruling on the constitutionality of the Zoning Amendment.

a newsstand is an activity protected by the First Amendment. The First Amendment status of a newsstand, however, has not been addressed by the Supreme Court nor by any court in the Second Circuit. This threshold issue must be decided as a matter of first impression in this Circuit.

■ The City argues that the operation of a newsstand is not a protected activity under the First Amendment, relying in large measure on a Seventh Circuit case. *Graff v. City of Chicago,* 9 F.3d 1309 (7th Cir.1993). In *Graff,* a newsstand operator challenged a Chicago ordinance that required all persons wishing to operate a newsstand first to obtain a permit from the city. In an *en banc* decision, a plurality of five judges concluded that newsstands were not protected by the First Amendment. According to the plurality, "building and operating a newsstand is conduct, not speech." *Id.* at 1315. Since "no person has a constitutional right to erect or maintain a structure on the public way," *id.* at 1314. "there is no constitutional right to build or maintain a newsstand on the public way," *id.* at 1317. Reasoning that newsstands "neither concern[ ] simply the circulation and printing of newspapers nor conduct commonly associated with expression," *id.* at 1316, the court concluded that they therefore do not implicate the First Amendment. *Id.* In addition to reaching this conclusion, the plurality analyzed the Chicago licensing ordinance under the time, place, and manner test normally used to evaluate content-neutral laws which burden speech or expression.

In a series of concurring and dissenting opinions, seven judges rejected the plurality's position that newsstands are not entitled to First Amendment protection. In a concurring opinion joined in by Judge Cudahy, Judge Flaum concluded that "the erection and maintenance of newspaper stands qualifies as 'conduct commonly associated with expression.'" *Id.* at 1327 (concurring opinion) (citing *City of Lakewood v. Plain Dealer Publisher Co.,* 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)). "Accordingly," Judge Flaum wrote, "Chicago's licensing ordinance ... implicates the First Amendment's protection of expression." *Id.* In a separate opinion joined in by Judges Rovner

and Cudahy, Judge Ripple also rejected the plurality's view that newsstands were not protected under the First Amendment, finding the plurality's declaration "that the placement of a newsstand, as opposed to a newsrack, does not implicate expressive activity" to be "untenable." *Id.* at 1333–34. Finally, two judges joined in Judge Cummings's dissent, which concluded not only that the plurality's refusal to acknowledge that newsstands were engaged in First Amendment activity was "insupportable," *id.* at 1336, but also that the licensing scheme's *de facto* status as a prior restraint required a higher degree of scrutiny than that provided by application of the traditional time, place and manner test.

At the heart of the disagreement between the five-judge plurality and the rest of the court was the degree to which case law governing regulation of "newsracks—that is, coin-operated newspaper vending machines— was relevant with regard to newsstands. While there are relatively few cases dealing with regulation of newsstands, there are many cases concerning newsracks. Of these, the Supreme Court's opinion in *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), is the most significant with regard to the present case. In *Lakewood,* the Court held that a licensing scheme for newsracks, which granted the town mayor "unfettered discretion" to approve or deny a permit application, was unconstitutional. The Court found that "whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers," the First Amendment is sufficiently implicated by a regulatory scheme, and that a facial challenge to the scheme is therefore appropriate. *Id.* at 759, 108 S.Ct. 2138. The Court pointed out that such a challenge was not available in all instances where such power to discriminate was apparent. Rather, "[t]he law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.* The Court found such a relationship present in *Lakewood's* newsrack licensing scheme for

two reasons. First, the scheme called for periodic renewal, which created opportunities for licensors to exert influence over the expression of the licensee. *Id.* at 759, 108 S.Ct. 2138. Second, the scheme was "directed narrowly and specifically at expression or conduct commonly associated with expression: the circulation of newspapers." *Id.* Without deciding whether the city could constitutional *ban* newsracks, the Court concluded that newsracks played a sufficiently central role in a core First Amendment activity to require that government efforts to *regulate* them be governed by familiar First Amendment principles.

The dissent in *Lakewood* rejected this conclusion, arguing that the placement of newsracks on city property was not protected by the First Amendment. The dissent argued that "the Plain Dealer's right to distribute its papers does not encompass the right to take city property—a part of the public forum . . .—and appropriate it for its own exclusive use, on a semi-permanent basis, by means of the erection of a newsbox." *Id.* at 778, 108 S.Ct. 2138 (White, J., dissenting). In other words, it argued, while the right to circulate newspapers as a general matter is protected, the right to employ a specific means of distribution is not.

The majority rejected the dissent's reasoning, finding that such a distinction between means and ends was illusive. Because the "actual activity at issue here is the circulation of newspapers, which is constitutionally protected," the majority concluded, the mere fact that the object of regulation in this case was vending machines (which, as the dissent pointed out, can be used to sell soft drinks as well as newspapers) was irrelevant to the legal analysis. Rather, the sale of a newspaper by means of a newsrack is merely the "manner" in which the First Amendment activity—the distribution of protected matter—is practiced, and its regulation was properly evaluated within the framework of the time, place and manner test traditionally used by the Court to evaluate such regulations. *Id.* at 768, 108 S.Ct. 2138.

Five years after *Lakewood,* the Supreme Court again considered a municipality's attempt to regulate newsracks. In *City of Cincinnati v. Discovery Network,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), the Court ruled that the City's ban on newsracks containing "commercial handbills," which did not apply to newsracks containing newspapers, was unconstitutional. The Court found that newsracks "continue to play a significant role in the dissemination of protected speech," and thus held that the categorical ban on newsracks distributing commercial handbills "cannot be squared with the dictates of the First Amendment." *Id.* at 431, 113 S.Ct. 1505.

Even before *Lakewood* and *Discovery Network* were decided, the Second Circuit recognized that "[t]he protection of the First Amendment extends to the sale of newspapers through newsracks." *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority,* 745 F.2d 767, 771 (2d Cir.1984). Courts in other circuits also extend First Amendment protection to newspaper distribution through newsracks. *See, e.g., Jacobsen v. Howard,* 109 F.3d 1268 (8th Cir.1997); *Sentinel Communications Co. v. Watts,* 936 F.2d 1189 (11th Cir.1991) (citing cases); *Jacobsen v. Lambers,* 888 F.Supp. 1088, 1093 (D.Kan.1995) (citing cases).

It is thus well settled that news*racks* implicate the First Amendment. The question that this court must therefore decide is whether *Lakewood* and its progeny require a finding that news*stands* are also protected by the First Amendment. The plurality in *Graff* argued that *Lakewood*'s protection of newsracks should not be extended to newsstands because:

Newsstands are large, permanent-type structures. They are constructed, and once in place they are not easily moved. Newsstands do not present one viewpoint; rather they supply many and varying editorial opinions. Newsstands shelter a business operator and his operation; they do not merely dispense or hand deliver newspapers. Newsstands also are more likely to obstruct the views of pedestrians and automobile drivers. In short, newsstands compared to newsracks are much larger, more permanent structures that occupy a significant portion of limited sidewalk space. Thus, building and operating

a newsstand is conduct, not speech, which the City can lawfully proscribe.

*Graff,* 9 F.3d at 1314.

The seven concurring and dissenting judges in *Graff,* however, were highly critical of this conclusion. Judge Cummings, for instance, noted that while "[i]t is true that the size of newsstands might make them a more inviting subject of municipal regulation," nonetheless

> size itself suggests nothing about whether the selling of newspapers and magazines from a stand is speech or conduct. And since the First Amendment is all about seeing to it that citizens have access to a wide variety of opinions and information, the fact that stands offer more opinions than racks would suggest that they should receive greater, not less protection.

*Id.* at 1336.

The court agrees with the seven concurring and dissenting judges in *Graff* and rejects the plurality's conclusion that the size of newsstands compared with newsracks does not provide a sufficient distinction on which to deny First Amendment protection. It might provide the City with grounds to impose more stringent regulations to ensure that newstands do not obstruct traffic flows or otherwise unreasonably impede the use of public streets, but such a legitimate basis for regulation does not excuse a failure to recognize the importance of newstands as a means by which residents of the City obtain news and other information. While the City argues that newsstands are mere commercial structures, the City's own regulations require that "[t]he Permittee shall at all times allocate at least one-half of the total available display space for the sale of newspapers and periodicals." Emery Decl.Ex. M (Occupancy Permit, ¶ 3).[2] This restriction suggests a recognition by the City that the operation of a newsstand is closely connected with the distribution of newspapers and periodicals. That newsstands disseminate a variety of views, rather than a single viewpoint, is not compelling from a First Amendment per-

spective. The Supreme Court, for instance, has recognized that the operator of a cable network exercises important First Amendment values in the process of making editorial decisions about the content of the programs that are presented to the public. *See, e.g., Turner Broadcasting System, Inc. v. Federal Communications Commission,* 512 U.S. 622, 637, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (" '[B]y exercising editorial discretion over which stations or programs to include in its repertoire,' cable programmers and operators 'see[k] to communicate messages on a wide variety of topics and in a wide variety of formats.' ") (quoting *Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 494, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986)).

■ Moreover, the distribution of printed material has long been protected by the First Amendment. Indeed, the historical purpose of the First Amendment was in large part to protect the free circulation of newspapers and periodicals. *See, e.g., Near v. Minnesota,* 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 583, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).

■ The protection afforded the distribution of printed material by the First Amendment is not lost simply "because the written material, sought to be distributed are sold rather than given away." *Heffron v. Int'l Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Riley v. Nat'l Fed'n of the Blind of North Carolina,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak."); *Murdock v. Pennsylvania,* 319 U.S. 105, 111, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Gannett Satellite Info. Network, Inc. v. Metro. Trans. Auth.,* 745 F.2d 767, 771 (2d Cir.1984).

---

**2.** The DOT's own regulations state that any newsstand operator who allocates half that amount to adult materials must be considered the operator of an "adult bookstore" for purposes of the adult use zoning law. Emery Decl. Ex. N, at 2 (Letter from Deputy Mayor Mastro to Robert Bookman, April 14, 1988).

■ Stated another way, the First Amendment protects not only the right to speak or write but also the public's right to purchase the information or opinions being made available. "Liberty of circulating is as essential to [the right or freedom of speech] as liberty of publishing, indeed, without the circulation, the publication would be of little value." *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (quoting *Ex parte Jackson*, 96 U.S. 727, 733, 24 L.Ed. 877 (1877)); *see also Distribution Systems of America, Inc. v. Village of Old Westbury*, 785 F.Supp. 347 (E.D.N.Y.1992) (finding unconstitutional municipal ordinance requiring license for distribution of newspapers); *Providence Journal Co. v. City of Newport*, 665 F.Supp. 107, 110 (D.R.I.1987) ("[T]he right to receive information is 'the indispensable reciprocal of any meaningful right of expression.'") (quoting *Sheck v. Baileyville School Committee*, 530 F.Supp. 679, 685 (D.Me. 1982)). That newsstand vendors engage in the commerce of speech on publicly owned sidewalks only enhances their claim to basic First Amendment protections. As stated by Justice Roberts:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all: it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

*Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

Accordingly, this court concludes that newstands, like newracks, are entitled to the protections of free speech and expression guaranteed by the First Amendment.[3]

### III. Unfettered Discretion

■ That an activity is found to be expressive and thus entitled to constitutional protection does not deprive the government of all authority to regulate the activity. Indeed, an activity that is protected may, under some circumstances, be banned entirely without violation of the constitution. Though the Supreme Court decided in *Lakewood* that newsracks were covered by the First Amendment, it left undecided whether a municipality would be constitutionally prohibited from banning the placement of newsracks on city streets and sidewalks. But where a total ban is not the issue—that is, where a municipality has decided to allow a particular type of protected speech activity to occur—it must ensure that any regulations it promulgates with regard to that activity, particularly those imposing any form of prior restraint on speech or expression, are free from even the possibility of censorship, bias, or discrimination. *Compare Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948) (holding unconstitutional ordinance prohibiting use of sound trucks without permission from police chief), *with Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (finding city's total ban on sound trucks constitutional).

■ The Supreme Court has established that any licensing or permitting scheme that regulates expressive activities must be constrained by articulated standards to guide the exercise of discretion by the licensor or permittor, because "a scheme that places 'unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" *Lakewood*, 486 U.S. 750, 757, 108 S.Ct. 2138

---

3. This conclusion is consistent with the views of the few other courts that have considered, either directly or tangentially, the First Amendment implications of newsstands. *See, e.g., Rubin v. City of Berwyn*, 553 F.Supp. 476 (N.D.Ill.) (newsstand vendors protected by First Amendment), *aff'd,* 698 F.2d 1227 (7th Cir.1982); *Hays County Guardian v. Supple*, 969 F.2d 111, 122 (5th Cir. 1992) (applying *Lakewood* First Amendment analysis to university dean's exercise of discretion in regulating placement of newsstands on university campus).

(1988). Thus, "a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 152, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). The Court has repeatedly found "unbridled" or "unfettered" discretion to violate the First Amendment.

> " 'It is settled by a long line of recent decisions of this Court that an ordinance which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.' "

*FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 226, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (quoting *Shuttlesworth,* 394 U.S. at 151, 89 S.Ct. 935).

In this case, the granting and renewal of newsstand permits is subject to the general rules governing City concessions, *see* Cummins Decl. Ex. B (Local Law 29); 12 RCNY § 1–01 *et seq.* (providing that "[t]his Chapter shall apply to initial grants of concessions as well as to renewals of concessions"), as well as provisions of the occupancy permits entered into by the individual newsstand vendors. These procedures provide ample constraints on the discretion of officials charged with reviewing applications and proposals and awarding concessions. The guidelines provide for *inter alia,* public notice of intent to award a concession. 12 RCNY § 1–06, active solicitation of bids, *id.* § 1–08, the public opening of bids, *id.* § 1–11(h), a list of criteria governing evaluation of a bid's "responsiveness," *id.* § 1–11(n), and written determinations regarding final decisions, *id.* § 1–11(n)(5).

In any event, plaintiffs do not challenge the granting or renewal provisions that apply only to the selection of news concessionaires. As explained earlier, these provisions, which require competitive bidding, were set aside

for plaintiffs and all other newsstand vendors in business when Local Law 29 came into effect. Instead, they were offered the opportunity to enter into concession agreements without competitive bidding. *See* Cummins Decl. Ex. B (Local Law, at 2).

Plaintiffs argue that the special system applicable to them, although allowing them to obtain concessions without competitive bids, grants City licensing officials too much discretion to withhold concessions from newsstand dealers whom it deems "unfit" to run a concession. Plaintiffs also contend that the provisions for judicial review of DOT decisions regarding the fitness of applicants are inadequate. Finally, plaintiffs argue that the DOT's discretion with regard to termination of concessions is "unfettered."

The City responds that the concession rules contain adequate standards to govern the Commissioner's evaluation of an applicant's "fitness" to run a concession. It also argues that the City is bound by law to leave termination decisions to the unfettered discretion of the Commissioner of Transportation (who acts through the DOT).

### 1. *Standards Governing Fitness determinations*

█ Plaintiffs object to a provision of Local Law 29 which, notwithstanding the City's promise to offer newspaper concessions to all previously licensed vendors, preserves the City's right to withhold a concession where it determines that the applicant is "unfit to operate a newsstand as a concessionaire or licensee." Cummins Decl. Ex. B (Local Law 29, at 5). Plaintiffs agree with the City that the standards governing the determination of "responsibility" are applicable in determining whether "a person or entity is unfit to be a concessionaire." Reply Brief at 14 n. 4. However, they do not agree with the City's position that these standards are sufficiently precise to protect plaintiffs' First Amendment rights.

Under the Rules of the City of New York, a "responsible bidder" is defined as "one which has the capability in all respects to perform fully the concession requirements." 12 RCNY § 1–11(m)(2)(i). The Rules provide

a list of factors,[4] including the following, to be considered in making this determination:
—Financial resources;
—Technical qualifications;
—Experience;
—Organization, material, equipment, facilities and personnel resources and expertise (or the ability to obtain them) necessary to carry out the work . . . ;
—A satisfactory record of performance;
—A satisfactory record of business integrity;
—Compliance with requirements for the utilization of small minority-owned and women-owned businesses as subcontractors, if any.

12 RCNY § 1–11(m)(2)(i).

The Rules also provide specific source listings which constrain the City in seeking outside information to "support determinations of responsibility or non-responsibility." *Id.* § 1–11(m)(5)(ii). If a negative determination is made, the City is obliged to provide the applicant with a written response "setting forth in detail and with specificity the reasons for the finding of non-responsibility."[5] *Id.* § 1–11(m)(6).

The criteria available to the Commissioner here for review of an applicant's fitness are comparable in specificity to the criteria used in *Graff* to review an application for a newsstand permit. Those criteria were found sufficient by nine of the twelve judges on the Seventh Circuit. *See Graff,* 9 F.3d at 1317. In *Graff,* the newsstand permit scheme provided a list of six "exclusive" factors that the Commissioner of Transportation could take into consideration in deciding whether to grant permission to build a newsstand. These factors were (1) newsstand design, (2) a vendor's compliance with the code, (3) pre-vious operation at that location, (4) alternative sources of the newsstand's products in the area, (5) the number of daily publications to be sold, and (6) the size of the newsstand and its proposed days of operation. Although the plurality recognized that evaluation of these factors bedroom for the exercise of some discretion. it concluded that these standards, coupled with the requirement that the Commissioner give written reasons for a permit denial, "give adequate and specific guidance to the commissioner." and "give the plaintiff adequate guidance in challenging the application of the ordinance to his particular case." *Id.* at 1317–18; *accord id.* at 1329 (Flaum.J. concurring) (finding, that "none of the six factors upon which the Commissioner of Public Works' permit decisions are based facially vest him with unbridled discretion in accepting and rejecting applicants").

The specificity of standards here contrasts sharply with the procedures found unconstitutional in *Lakewood. See* 486 U.S. at 754, 108 S.Ct. 2138. The municipal ordinance struck down by the Court provided Lakewood's mayor with unguided authority to grant or deny permits. The only limitation on the exercise of discretion was a requirement that when a license was denied, the mayor must state a reason for the denial. These reasons, the Court noted, could be perfunctory. "[N]othing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." *Id.* at 769, 108 S.Ct. 2138. The Court rejected the municipality's argument that the statute implicitly required the mayor to consider only such things as "the health, safety, or welfare of Lakewood citizens." The Court's jurisprudence in this area "requires that the

---

4. The concession rules stipulate that "[f]actors affecting a bidder's responsibility may include" various listed criteria. 12 RCNY § 1–11(m)(2)(i). Plaintiffs argue that this language implies that the factors are not exclusive. Except to the extent that the rules provide additional grounds on which an administrator could evaluate a prospective concessionaire's "responsibility," the court deems the Rules to create an exclusive set of criteria which the administrator "may" consider. That is, it appears to the court that while the rules do not require the administrator to consider all the listed criteria, they do not permit him to consider any that are not listed.

5. In some cases, special standards of responsibility may be formulated and applied to a particular class of concessionaires. In the event that such standards are used, however, the City is required to demonstrate a need for them, and may not use them as a pretext to limit competition. *See* 12 RCNY § 1–11(m)(3). No such special rules have been formulated to govern newsstand concessionaires.

limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood,* 486 U.S. at 770, 108 S.Ct. 2138.

Upon reviewing the criteria listed for determinations regarding a potential newsstand concessionaire's "fitness," the court concludes that it provides sufficient guidance to ensure that newsstand concessions are not denied on the basis of factors prohibited by the First Amendment. Unlike those in *Lakewood,* the standards here direct the Commissioner's attention to reasonably ascertainable and objective factors, such as a vendor's financial resources, work experience, and past business history. A negative finding based on these criteria would provide a verifiable basis upon which a court could review the decision. Thus, the court finds it unlikely that plaintiffs will prevail in their contention that the Commissioner exercises "unfettered discretion" in determining the fitness of concession applicants.

### 2. Provision for Judicial Review

█ In *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 228–29, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (plurality opinion), the Supreme Court ruled that in a licensing scheme where operators of adult establishments were required by the city to obtain operating licenses, two procedural checks on the exercise of the licensing power were essential. "[T]he licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied." *Id.* at 228, 110 S.Ct. 596 (citing *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).) Plaintiffs contend that the newsstand vending scheme falls short of these requirements. Specifically, plaintiffs argue that the regulations do not require a "prompt" decision on a permit application and that procedures for judicial review are insufficient when DOT has denied a permit application because it found a newsstand concession applicant to be "unfit" or "nonresponsible."

With regard to the first procedural safeguard relating to how long an applicant must wait for a decision, under the Rules of the City of New York, a finding by the DOT that an applicant for a newsstand concession is "unfit" must be rendered in writing and must be mailed within two days after the determination. That finding is then appealable to the Commissioner of DOT within five days of receipt. *Cf. TK's Video v. Denton County,* 24 F.3d 705, 708 (5th Cir.1994) (concluding that 60 day period for acting on license applications for adult businesses imposes no undue burden). The Commissioner is required then to "make a prompt written decision with respect to the merits of the bidder's appeal," which shall be considered final. 12 RCNY § 1–11(m)(7). While plaintiffs do not contest that applicants receive a speedy initial answer on their application, they do object that the requirement that the Commissioner's decision be "prompt" is too imprecise to satisfy the law. The court disagrees. Although the term "prompt" does not affix a precise duration to the time period in which a decision may be reviewed, courts are able to determine whether such a standard has been met in a particular case, and a statute's failure to specify precise durational requirements does not necessarily render it unconstitutional. *See, e.g., United States v. Thirty–Seven Photographs,* 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) (finding statute requiring forfeiture of obscene materials to be constitutional by reading into it express time limits for commencement and completion of judicial proceedings that allow it to satisfy *Freedman* "promptness" requirements). The provision thus satisfies the first requirement set out in *FW/PBS.*

As for the second procedural Safeguard— that there be available "prompt judicial review"—the rationale for upholding the constitutionality of the scheme under the case law is somewhat less clear. There is significant disagreement among the circuits with regard to whether the denial of a license affecting an applicant's First Amendment rights demands special judicial procedures, or whether prompt access to state courts is sufficient to satisfy the requirement. *Compare Graff,* 9 F.3d 1309 (7th Cir.1993) (availability of cer-

tiorari proceeding sufficient to satisfy requirements for prompt judicial review), *with* *11126 Baltimore Boulevard, Inc. v. Prince George's County, Maryland*, 58 F.3d 988 (4th Cir.1995) (holding that appeal to regular state courts is not sufficient under *FW/PBS* standards).[6]

The City argues that sufficient judicial review is provided by the availability of a proceeding pursuant to Article 78 of New York's Civil Procedure Law.[7]

An Article 78 proceeding is a form of action providing relief that was previously obtained by writs of certiorari, mandamus, and prohibition. *See* N.Y. CPLR § 7801 (McKinney 1994). Neither Supreme Court nor Second Circuit case law has addressed whether an action brought pursuant to Article 78 is sufficient to satisfy the requirements noted in *FW/PBS*. The statutory Scheme here, however, is virtually identical to the Illinois scheme reviewed by the Seventh Circuit in *Graff*. As the court explained, under Illinois law, "[t]he appropriate method to review Chicago's administrative agency decisions is by the common law writ of certiorari." *Graff*, 9 F.3d at 1325. The court described a certiorari action as follows:

> Unless excused, claimants have six months to file, wherein review "is extremely broad in scope, and extends to all questions of fact and law contained in the record before the court, including *de novo* review of any constitutional issues." [T]he court determines from the record alone whether there is any evidence fairly tending to support the order reviewed, and the court cannot set aside the order unless it is contrary to the manifest weight of the evidence.... [F]indings and conclusions on questions of fact are prima facie true and correct. It is not the court's function to resolve conflicting evidence. "If the circuit court, on the return of the writ,

finds from the record that the inferior tribunal proceeded according to law, the writ is quashed; however, if the proceedings are not in compliance with the law, the judgment and proceedings shown by the return will be quashed."

*Id.* (citations omitted).

The standards for review under the common law writ of certiorari considered by the Seventh Circuit in *Graff* are similar to those under Article 78. While Article 78 incorporates different legal analyses depending on whether the action is brought in the nature of certiorari, mandamus, or prohibition, a proceeding to challenge a determination of nonresponsibility would be in the nature of mandamus to review. *See Schiavone Const. Co., Inc. v. Larocca*, 117 A.D.2d 440, 503 N.Y.S.2d 196 (3d Dept.1986). The standard in mandamus to review is whether the decision was "arbitrary and capricious or an abuse of discretion." *See* N.Y. CPLR § 7803.

The New York Court of Appeals has described a mandamus to review action as follows:

> In a proceeding in the nature of mandamus to review, ... a court examines an administrative action involving the exercise of discretion. Mandamus to review resembles certiorari, except that in a certiorari proceeding a quasi-judicial hearing normally is required and the reviewing court has the benefit of a full record. The standard of review in a certiorari proceeding is "substantial evidence.... In a mandamus to review proceeding." However, no quasi-judicial hearing is required; the petitioner need only be given an opportunity "to be heard" and to submit whatever evidence he or she chooses and the agency may consider whatever evidence is at hand, whether obtained through a hearing

---

**6.** Plaintiffs point to *Lakewood* for authority, but nothing in *Lakewood* indicates that where an initial licensing, decision is content-neutral is made promptly, and is constrained by proper standards, special procedures for judicial review are also necessary. In *Lakewood*, rather, the Court concluded that judicial review could not compensate for defective procedures in the first instance. 486 U.S. at 771, 108 S.Ct. 2138 ("Even if judicial review were relatively speedy,

such review cannot substitute for concrete standards to guide the decision-maker's discretion.").

**7.** The Rules governing concessions indicate that an applicant might also bring a complaint to the Comptroller. Applicants may seek the review of the New York City Comptroller if they believe they have been the victim of bias, discrimination, or corruption. *See* 12 RCNY § 1–11(b)(xi).

or otherwise. The standard of review in such a proceeding is whether the agency determination was arbitrary and capricious or affected by an error of law.

*Scherbyn v. Wayne–Finger Lakes Bd. of Coop. Educ. Services,* 77 N.Y.2d 753, 757–58, 570 N.Y.S.2d 474, 573 N.E.2d 562 (1991) (citations omitted). As one commentator has noted, there is little functional difference between the "arbitrary and capricious" standard used in mandamus actions and the "substantial evidence" standard applied in certiorari actions. *See* David D. Siegel, *New York Practice* § 561. (2d ed.1991), *Pell v. Board of Ed.,* 34 N.Y.2d 222, 231, 356 N.Y.S.2d 833, 313 N.E.2d 321 (1974) ("Rationality is what is reviewed under both the substantial evidence rule and the arbitrary and capricious standard.")

An Article 78 proceeding is thus functionally similar to an action brought pursuant to the common law writ of certiorari considered in *Graff.* After reviewing the procedural structure, a majority of judges in *Graff* concluded—though for differing reasons—that the availability of a certiorari action constituted sufficiently prompt judicial review. The five judge plurality in *Graff* held that because an unsuccessful applicant for a permit could obtain judicial review through the common law writ of certiorari and could raise his constitutional claims through that mechanism, judicial review was available for the purposes of the First Amendment.

Four other judges agreed with the plurality that the system for granting permits did not violate the *Freedman–FW/PBS* requirements. Judge Flaum reasoned that extraordinary provisions for judicial review were mandated only where an administrator was exercising discretion to make content-based judgments about whether expressive materials were protected by the First Amendment. Where these kinds of content-based judgments are made, he wrote, "we wisely do not trust to administrative officials [such discretion] without the benefit of a watchful judicial eye." *Graff,* 9 F.3d at 1333 (Flaum, J., concurring). Judge Flaum explained, however, that extraordinary judicial review procedures were not needed when an administrator's job is merely "to make the kind of determina-

tions for which they are especially suited; e.g. questions about city aesthetics, traffic flow or City Code violations." *Id.* Having decided that the permitting scheme in *Graff* entailed the evaluation of non-content-based criteria. Judge Flaum concluded that the ordinary procedures for judicial review were sufficient to satisfy the constitutional requirements. Judge Ripple also concurred for substantially the same reasons. *See id.* at 1335 (Ripple, J., concurring).

Of the other circuit courts that have considered the appropriate standard to be applied with respect to licensing schemes implicating the First Amendment, at least two have decided that where a statute or ordinance is a content-neutral time, place and manner restriction, something less than a specially mandated provision for judicial review in the ordinance is sufficient, as long as prompt access to judicial review is available. *See TK's Video v. Denton County,* 24 F.3d 705, 709 (5th Cir.1994) (upholding licensing scheme whereby unsuccessful license applicant has 30 days to appeal to a district court on a "trial de novo basis"); *Grand Brittain, Inc. v. City of Amarillo, Texas,* 27 F.3d 1068, 1070–71 (5th Cir.1994) (finding requirement for expeditious judicial review satisfied where unsuccessful licensing applicant "can immediately challenge the regulatory decision in court and request a temporary restraining order to prevent closing a business"); *Jews for Jesus v. Massachusetts Bay Trans. Auth.,* 984 F.2d 1319, 1327 (1st Cir. 1993) (finding that FW/PBS standards for prompt judicial review were met where denied applicant could file appeal pursuant to general Massachusetts procedures for informal review of agency decisions); *see also 11126 Baltimore Blvd., Inc. v. Prince George's County,* 58 F.3d 988, 1003 (4th Cir. 1995) (Niemeyer, J., concurring in part and dissenting in part). *But see id.* (majority opinion) (holding that access to regular avenues of judicial review to challenge administrative decisions is insufficient under *FW/ PBS*).

As in the Chicago permitting scheme, DOT's discretion here is limited by objective criteria in determining whether an applicant is "nonresponsible" and thus unfit to run a

concession. Thus, officials are not engaging in the kind of content-based judgments about expressive material that were contemplated in *Freedman's* review of a movie censorship scheme. Nor are licensing officials here administering an "adult establishment" ordinance like those reviewed in *FW/PBS* and the cases following it, which, though deemed on their face to be content-neutral, nevertheless rely on a content-based classification for their application. Thus, while *Lakewood* and *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), establish that licensing schemes that have the effect of imposing a prior restraint on speech must contain standards to guide the licensor's discretion and must include time limits to ensure that a decision is made promptly, the requirement that the ordinance provide an explicit mechanism for judicial review may not for the reasons outlined by Judge Flaum in *Graff*, always be necessary. Specifically, such special provisions may not be necessary where, as here, an ordinance is content-neutral, the licensor's discretion is not "unfettered," the statute requires that the request for a license be acted on promptly, and the administrative determination is based on criteria that are within the administrator's normal expertise.

If any abuse does occur, an Article 78 proceeding provides an unsuccessful applicant with a forum in which to make all constitutional challenges. *See, e.g., Cahill v. Public Serv. Comm.*, 76 N.Y.2d 102, 556 N.Y.S.2d 840, 556 N.E.2d 133 (1990) (upholding Supreme Court ruling in Article 78 proceeding that utility policy violated petitioner's First Amendment rights); *Lucas v. Scully*, 71 N.Y.2d 399, 526 N.Y.S.2d 927, 521 N.E.2d 1070 (1988) (considering First Amendment challenge to prison's inmate correspondence program); *Zorach v. Clauson*, 303 N.Y. 161, 100 N.E.2d 463 (1951) (Article 78 proceeding challenging constitutionality of school release-time policy on First and Fourteenth Amendment grounds); *Patel v. New York City Art Commission*, 5/11/94 NYLJ 31 (col.6) (1st Dept.) (considering First Amendment arguments of unsuccessful applicant seeking license to build newsstand). In addition. because the Commissioner's decision is deemed to be a final administrative decision under the regulations, *see* 12 RCNY § 1–11(n)(7)(v), such a decision can be immediately appealed through an Article 78 proceeding. Article 78 also provides that a petitioner may secure a stay from the court pending resolution of the petition. NY CPLR § 7805. This relief would potentially be available upon presentation of the petition to the court, and, if granted, would eliminate the possibility that a decision based on illicit content-based factors would stand. Thus, following the lead of the nine judges who upheld the review provisions in Chicago's permitting scheme in *Graff*, the court concludes that recourse to Article 78 here likely constitutes a sufficient procedural safeguard for newsstand vendors who are deemed "unfit" or "non-responsible" by DOT.

Standards in this area of the law, however, are ill-defined. Circuit courts applying *FW/PBS* are split over the need to provide express procedural provisions for judicial review, rather than simply to ensure that regular avenues of review remain open and accessible to denied license applicants. *Compare Grand Brittain, Inc.*, 27 F.3d 1068 (5th Cir.1994); *Graff*, 9 F.3d 1309 (7th Cir. 1993); *Jews for Jesus*, 984 F.2d 1319 (1st Cir.1993); *with 11126 Baltimore Blvd. Inc.*, 58 F.3d at 1002 (4th Cir.1995) (finding delay, of 103 days, after administrative delay of 150 days, unconstitutional); *East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220 (6th Cir.1995) (finding that state certiorari proceeding did not sufficiently guarantee prompt judicial review); *Redner v. Dean*, 29 F.3d 1495 (11th Cir.1994) (holding that "a state's statutory or common-law mechanisms for review of administrative decisions does not satisfy the procedural requirements of *Freedman*"). These circuits are also divided over whether the *FW/PBS* mandate of "prompt judicial review" simply means expeditious access to judicial review, or rather requires that the review process be completed and a judicial decision rendered within the "prompt" period. *Compare 11126 Baltimore Blvd.*, 58 F.3d at 1001 n. 17 (rejecting contention that mere availability of judicial review satisfies the prompt judicial review requirement set

forth in *Freedman* and *FW/PBS* ), *with TK's Video,* 24 F.3d at 709 (holding that state is simply required to offer "fair opportunity" to complete administrative process and access courts within brief period, and rejecting contention that judicial decision must also be rendered in such brief period, because "[a] 'brief period' within which all judicial avenues are exhausted would be an oxymoron").

Finally, the *Graff* opinion itself is split over whether the procedural safeguards discussed in *Freedman* in the context of film censorship schemes and modified in Justice O'Connor's opinion in *FW/PBS* with reference to the licensing of adult establishments, are applicable in the different context presented in this case. *See, e.g., Marty's Adult World v. Town of Enfield, Connecticut,* 20 F.3d 512 (2d Cir.1994) (holding that *Freedman* procedural safeguards were not applicable where permitting requirement did not impose prior restraint on speech).

Neither party in this case has addressed any of the complex and unsettled issues relating to the need for special provisions for judicial review. While plaintiffs contend that an Article 78 proceeding is not a sufficiently "prompt" form of judicial review to satisfy the First Amendment they have presented no arguments and cited no authority in support of that position. Accordingly, the court relies upon the analysis set forth above to conclude at this juncture that while plaintiffs' claim is not wholly without merit, plaintiffs have not demonstrated a sufficient likelihood of prevailing on the merits of their constitutional challenge to justify the remedy of a preliminary injunction on the ground that the concession scheme does not adequately provide for judicial review.

### 3. Standards Governing Termination Decisions

■ While the court finds sufficient guidelines in place to govern the exercise of discretion in the granting and renewing of permits, the same cannot be said for current provisions regarding the termination of newsstand concessions. Nothing in the previously described section of the Rules dis-

cusses procedures or guidelines governing the termination of concessions. Moreover, Local Law 29 explicitly states that "nothing shall limit the Commissioner of the Department of Transportation's authority to terminate a newsstand concession." Cummins Decl. Ex. B (Local Law 29, at 2). The same proviso is written into the occupancy permit agreements themselves: "[i]t is expressly understood that ... the Permittor shall have the unconditional right to revoke and terminate this Permit upon 10 days written notice to Permittee." Emery Decl. Ex. M (Occupancy Permit, ¶ 32). The City concedes that "there is no written criteria or regulation" governing the exercise of the Commissioner's discretion to terminate a concession agreement. *See* Trans. of Telephone Conf. Proceedings, May, 1998 (comments of Sherrill Kurland. Ass't Corp. Counsel). Rather, "it is [an] unconditional right of revocation under the terms of the agreement." *Id.* Accordingly, it is clear to the court that under the new scheme, there are no written rules or guidelines limiting the Commissioner's discretion in terminating concession agreements.

■ The City argues, however, that when DOT enters into such concession agreements, it must, as a matter of law, preserve the right to revoke at will in order to prevent the agreement from being construed as a lease, as the Commissioner has no power to alienate public land, and a lease constitutes a form of alienation. The City's argument is apparently premised on definitions of leases and licenses under New York law. "A document calling itself a 'license' is still a lease if it grants not merely a revocable right to be exercised over the grantor's land without possessing any interest therein but the exclusive right to use and occupy that land." *Miller v. City of New York,* 15 N.Y.2d 34, 255 N.Y.S.2d 78, 203 N.E.2d 478 (1964). From the case law cited by defendants, however, it is not clear that the mere absence in the license or concession agreement of a revocable-at-will clause would, under the circumstances of this case, necessarily transform the agreement into a lease.[8]

8. As a general matter it is certainly true that one    attribute of a license is that it is "cancelable at

But the court need not address the City's rationale for including the revocable-at-will clause in the contract since the City has failed even to dispute that it could satisfy the First Amendment without excising this provision from the agreement. The City has made no argument, nor pointed to any authority, indicating why guidelines governing the exercise of the Commissioner's power to revoke in a manner consonant with the First Amendment necessarily would transform the occupancy agreement into a lease or otherwise impermissibly alienate public property.

The City's claim that guidelines governing the exercise of the Commissioner's power to revoke the concession agreements would violate New York law fails to take account of the fact that under the prior licensing scheme, the Commissioner's authority to terminate newsstand licenses was expressly restricted. The applicable provisions of the New York City Administrative Code provided that:

> [t]he commissioner shall be authorized, upon due notice and hearing, to suspend, revoke or cancel any license issued by him or her ... for the violation of (i) any of the provisions of chapter two of this title and regulations and rules promulgated under chapter two of this title and (ii) any of the provisions of any other law, rule or regulation ... provided that such violation is committed in the course of and is related to the conduct of the business ... which is required to be licensed.

N.Y.C.Admin.Code § 20–104e(1) (1986). Other sections of the code then applicable to the licensing of newsstands provided that licenses could be revoked if they were abandoned, or if the licensed newsstand was not used to sell newspapers and periodicals, *id.* § 20–232 (1993), and that newsstands could be temporarily removed by enforcement offi-cials when exigent circumstances existed, *id.* § 20–240.1. In sum, the old licensing scheme empowered the Commissioner to revoke a license only where the newsstand vendor had violated a law or regulation relevant to the conduct or his business. The licensing law also provided that termination could occur only after due notice and a hearing.

The new concession scheme does not provide any of these protections to newsstand vendors. The revocation-at-will provisions give the Commissioner power to terminate a contract on 10 days notice, with no hearing, for any reason whatsoever. *See* Emery Decl. Ex. M (Occupancy Permit, ¶ 32).

Such power to revoke at will can chill newsstand vendors' exercise of First Amendment rights. As Justice Brennan explained in *Lakewood,* referring to the threat of self-censorship inherent in a licensing scheme which leaves unfettered discretion to grant or deny permit applications in the hands of the mayor, "[i]t is not difficult to visualize a newspaper that relies to a substantial degree on single issue sales feeling significant pressure to endorse the incumbent mayor in an upcoming election, or to refrain from criticizing him, in order to receive a favorable and speedy disposition on its permit application." 486 U.S. at 757–58, 108 S.Ct. 2138. The risk of self-censorship identified by Justice Brennan is as relevant to a newsstand as to a newsrack. Under the terms of the current scheme, a newsstand vendor's decision to carry literature disapproved of by City licensing officials could lead to termination of the permit, virtually without recourse. A vendor, for instance, might refrain from selling even a small number of constitutionally protected adult magazines—or, for that matter, any publication or a politicized nature—out of a reasonable fear of censure. "Only standards limiting the licensor's discretion

---

will, and without cause," while leases are created "where one party's interest in another's real property exists for a fixed term, not revocable at will, and terminable only on notice." *Park v. Automotive Realty Corp.,* No. 94–4451, 1998 WL 40199, at *2 (S.D.N.Y.1998) (unpublished opinion) (quoting *American Jewish Theatre, Inc. v. Roundabout Theatre Co., Inc.,* 203 A.D.2d 155, 610 N.Y.S.2d 256 (1st Dept.1994)). As another New York state case points out, however, "[a]lthough a revocation clause may be relevant to the determination of whether an agreement is a license or a lease," the New York Court of Appeals has nonetheless found that an "agreement to operate newsstands in the New York City subway system ... with no revocation-at-will provision was a license." *Ott v. Doyle,* 171 Misc.2d 491, 494, 654 N.Y.S.2d 975 (Sup.Ct. 1997). Accordingly, it is unclear whether the mere absence of a revocation-at-will provision in the contract would necessarily render the agreement a lease rather than a license.

will eliminate this danger by adding an element of certainty fatal to self-censorship." *Id.* at 758, 108 S.Ct. 2138. The lack of clearly articulated standards governing termination of a license or permit is at least as chilling of speech rights, and perhaps significantly more so, as it is in the context of initial grant or renewal. As in *Lakewood*, "[t]he doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood*, 486 U.S. at 770, 108 S.Ct. 2138.

The court therefore finds a high likelihood that plaintiffs will prevail on the merits of their claim that the revocable-at-will provisions of Local Law 29 and the occupancy permit agreements are unconstitutional.

### IV. Is Plaintiffs' Tax on Speech Claim Barred by the Tax Injunction Act?

■■■ Plaintiffs assert that the City's plan to increase dramatically the cost of running a newsstand in New York City amounts to an unconstitutional tax on the exercise of plaintiffs' First Amendment rights. "[A] state may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock*, 319 U.S. at 113, 63 S.Ct. 870. This is not to say that the state is barred from levying a fee or tax on all expressive activities. As the Supreme Court held in *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), the state can impose a reasonable fee on certain kinds of expressive activities, as long as the charge imposed does not exceed the administrative costs of regulating the protected activity.

Before the court can consider the issue of whether the City's plan to increase the fee for selling newspapers from $538 to up to $5,000 is in fact an impermissible tax on a protected First Amendment activity, however, the court must resolve a preliminary issue. Does the Tax Injunction Act, 28 U.S.C. § 1341, deprive the court of jurisdiction to hear plaintiffs' challenge?

■■■ The Tax Injunction Act provides that: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." The Act was passed by Congress in 1937 out of a "concern to confine federal court intervention in state government," particularly in regard to "questions of state taxation." *Arkansas v. Farm Credit Services of Central Arkansas*, 520 U.S. 821, 117 S.Ct. 1776, 1780, 138 L.Ed.2d 34 (1997). Moreover, this limitation has not been narrowly construed, but rather constitutes a "broad restriction on federal court jurisdiction." *Collins Holding Corp. v. Jasper County, South Carolina*, 123 F.3d 797, 799 (4th Cir.1997). Because the Tax Injunction Act erects a bar to the subject-matter jurisdiction of a federal district court, it does not matter that the parties did not raise the issue in the first instance. If the Tax Injunction Act is applicable, the court is obligated to raise the issue on its own initiative. *See id.* (remanding case to district court where Tax Injunction Act issue had neither been raised by parties nor considered by district court).

■■■ With the issue having been raised by the court, plaintiffs make two arguments as to why this court should retain jurisdiction to hear their claim. First, they argue that the Tax Injunction Act does not apply "[w]hen a payment scheme is directed at the exercise of a First Amendment right." Pl's Reply Brief, at 17. Plaintiffs argue that the Act precludes jurisdiction only "where a taxing statute of general applicability has an 'incidental effect on free speech activities.'" *Id.* Second, plaintiffs argue that the "occupancy charge" imposed on newsstand vendors is not a "tax" within the meaning of the Act.

■■■ Regarding the first argument, the Supreme Court has made clear that there is no exception to the Tax Injunction Act when the challenged tax is alleged to violate First Amendment rights. "Carving out a special exception for taxpayers raising First Amendment claims would undermine significantly Congress' primary purpose 'to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes.'" *California v. Grace Brethren Church*, 457 U.S. 393, 416–17, 102 S.Ct. 2498, 73 L.Ed.2d 93 (*quoting Rosewell*

*v. LaSalle Nat'l Bank,* 450 U.S. 503, 522, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981)).

The "tax on speech" cases do not suggest otherwise. A partial survey of Supreme Court cases addressing the issue confirms that such cases usually have reached the Court not via lower federal courts, but by way of certiorari to the highest state court. *See, e.g., Leathers v. Medlock,* 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991) (reversing decision of Arkansas Supreme Court which found unconstitutional extension of generally applicable state tax to cable television services but not print media); *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) (reversing Arkansas Supreme Court and finding sales tax scheme exempting newspapers and journals violated First Amendment); *Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (reversing finding of Minnesota Supreme Court that tax on cost of paper and ink products was constitutional); *Follett v. Town of McCormick, S.C.,* 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944) (reversing Supreme Court of South Carolina and striking down town ordinance requiring agent selling books to pay license fee); *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (reversing Superior Court of Pennsylvania decision upholding ordinance placing license tax on sale of religious literature); *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (affirming Supreme Court of New Hampshire in upholding assessment of fee for parade).

Where lower federal courts have found jurisdiction to hear challenges to a state or municipal scheme that imposed fees on expressive activities, it is apparent that the fee in question could not plausibly have been construed as a tax within the meaning of the Tax Injunction Act. The First Amendment issue raised in those cases has not focused on the question of whether a measure calculated to generate revenues from an expressive activity is an unconstitutional tax on speech. Rather, those cases concern whether a fee imposed by the state, purportedly to defray regulatory costs, accurately reflected the state's actual administrative and enforcement costs regarding the expressive activity in question. A review of the cases cited by plaintiffs indicates as much. *See, e.g., Nationalist Movement v. City of Cumming,* 913 F.2d 885 (11th Cir.1990) (holding that county ordinance providing for permit fee of up to $1,000 for each day of parade was unconstitutional), *affirmed sub nom. Forsyth County v. Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *Northeast Ohio Coalition for the Homeless v. City of Cleveland,* 105 F.3d 1107 (6th Cir.1997) (license fees on street peddlers found to defray administrative costs); *National Awareness Foundation v. Abrams,* 50 F.3d 1159 (finding that license fee reasonably reflected administrative and enforcement costs); *Center for Auto Safety, Inc. v. Athey,* 37 F.3d 139 (4th Cir.1994) (finding user fees narrowly tailored for regulatory purpose); *Sentinel Communications Co. v. Watts,* 936 F.2d 1189 (11th Cir.1991) (remanding for further evidentiary proceedings to determine whether fee on newsracks actually reflected administrative costs); *Central Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515 (11th Cir.1985) (striking down scheme in which demonstrators must prepay anticipated enforcement costs for demonstration); *Chicago Newspaper Publishers Assn. v. City of Wheaton,* 697 F.Supp. 1464 (N.D.Ill.1988) (striking down ordinance where not evidence supported claim that fee on newsracks accurately reflected administrative costs).

In short, there is no basis under the Tax Injunction Act for a district court to assume jurisdiction merely because the alleged tax is directed solely at an activity protected by the First Amendment.

▆▆▆ This is not to say that whenever a state-imposed fee is at issue the Tax Injunction Act bars jurisdiction over the claim. For the jurisdictional bar to apply, two elements must be present. First, the fee must be determined to be a "tax," since the bar established by the Act applies only to "taxes," and does not bar jurisdiction over cases involving "regulatory fees." Second, there must be "a plain, speedy and efficient remedy" in the state courts. *See Kraebel v. New York City Dep't of Housing Preservation*

*and Development,* 959 F.2d 395, 400 (2d Cir. 1992). Plaintiffs do not argue that the remedy available to them in the state court fails this standard. Accordingly, the only issue that must be decided is whether the "occupancy charge" imposed on newsstand vendors under the concession scheme is a tax within the meaning of the Act.

To determine whether a measure that raises revenue is a tax for purposes of the Act, rather than merely a "regulatory fee," courts "have tended ... to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's costs of regulation." *Travelers Ins. Co. v. Cuomo,* 14 F.3d 708, 713 (2d Cir.1993) (quoting *San Juan Cellular Tel. Co. v. Public Serv. Comm'n,* 967 F.2d 683, 685 (1st Cir.1992)), *rev'd on other grounds sub nom., New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 653, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). Using this analytical framework, the Second Circuit in *Travelers* concluded that a New York statute imposing surcharges on hospital rates for certain payors was a "tax" for the purposes of the Tax Injunction Act, because "notwithstanding the primary [regulatory] purposes ascribed to the surcharges by the State, both [surcharges] raise revenue which is ultimately paid into the State's general fund." *Id.*

There is no dispute in the present case that revenues derived from the City's concession scheme flow into the City's general revenue fund. Nevertheless, as the Second Circuit acknowledged in *Travelers,* "there is no bright line between assessments that are taxes and those that are not." 14 F.3d at 713. Thus, a court must look beyond the mere fact that a scheme raises revenue.

> [Courts] have sketched a spectrum with a paradigmatic tax at one end and a paradigmatic fee at the other. The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. The classic "regulatory fee" is imposed by an agency upon those subject to its regulation. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation related expenses.

*Collins Holding Corp. v. Jasper County, S.C.,* 123 F.3d 797, 799 (quoting *San Juan Cellular,* 967 F.2d at 685 (citations omitted)).

The occupancy charge at issue in this case possesses two characteristics that move it towards the "fee" end of the spectrum. First, the charge is administered by the Department of Transportation rather than by the general taxing authority. Second, it is levied upon a limited class of persons, *i.e.,* newsstand vendors, rather than upon "many or all citizens." *See San Juan,* 967 F.2d 683 (1st Cir.1992) (finding that "periodic fee" assessed on private company was not a "tax" because, *inter alia,* it was not imposed on general public); *Miami Herald Publishing Co. v. City of Hallandale,* 734 F.2d 666 (11th Cir.1984) (finding that occupational license fee on all vending machines, including newsracks, was tax for purposes of Tax Injunction Act).

Nonetheless, as the Fourth Circuit stated in *Collins,* and as the Second Circuit's analysis in *Travelers* indicates, "the heart of the inquiry centers on function, requiring an analysis of the purpose and ultimate use of the assessment." *Collins,* 123 F.3d at 800. An analysis of the purpose and use of the assessment in this case leads the court ultimately to conclude that, despite certain "fee-like" attributes, the occupancy charge is a "tax" within the meaning of the Tax Injunction Act.

The purposes of the scheme enacted in Local Law 29 were summarized in the Declaration of Legislative Findings and Intent:

> The Council hereby finds and declares that the present procedures for the licensing of newsstands are inefficient and do not operate well in conjunction with procedures for the placement of other structures and objects on the City's sidewalks. In addition, the current method of regulating newsstands does not provide sufficient controls

to address all of the concerns they present, including public safety and pedestrian traffic. A new approach needs to be formulated so that newsstands can adequately serve the public without, among other things, overcrowding the City's sidewalks and threatening pedestrian safety.

\* \* \* \* \* \*

The Council finds that ... there should be a moratorium on the issuance of newsstand licenses by the Department of Consumer Affairs and the City should receive revenues for the use of its sidewalks by newsstands.

Cummins Decl.Ex. B (Local Law 29, at 2). These statements indicate that the purposes of the plan are, at least partly, regulatory. The City Council intended to create a regulatory scheme whereby newsstand placement and operation would be better coordinated with the City's other goals for regulating street furniture, including implementation of the Coordinated Street Furniture Franchise Proposal. This fact weighs in favor of finding the charge to be a regulatory fee, because where the predominant purposes of a legislative scheme are regulatory, the mere fact that the scheme also raises revenue does not transform the scheme into a tax. For instance, in *Hager v. City of West Peoria,* 84 F.3d 865 (7th Cir.1996), a city ordinance which assessed a twenty dollar permit fee on trucks carrying heavy loads was not considered to be a tax, even though the revenues derived from the fee were deposited in the city's general fund. The court concluded that this scheme did not impose a tax within the meaning of the Act since "the revenue generated from the permit fees could not exceed the amount necessary to pay for the road repair made necessary by the heavy traffic." *Id.* at 871. Moreover, the court pointed out, the legislative findings of the ordinance made no mention of any purpose of the scheme to raise revenue. *Id.*

In the instant case, however, the revenue generated by the occupancy charge is not clearly "only incidental to [the] regulatory nature" of the plan. *Id.* The record before the court strongly supports the City's contention that the scheme was intended in significant part to raise revenues. For instance,

unlike in *Hager,* here the City Council unambiguously stated in its legislative findings that "the City should receive revenues for the use of its sidewalks by newsstands." Cummins Decl.Ex. B (Local Law 29, at 2); *see also* Emery Decl.Ex. D (Resolution of the Franchise and Concession Review Committee) (emphasizing Council's finding that City should receive revenues for use of sidewalks). The Council's findings thus indicate that the plan was not exclusively a regulatory scheme. In explaining the purposes of Local Law 29, a City official explained that:

> [T]his legislation continues to protect those who have been in the newsstand business for quite some time. It will change the way their operations are regulated by the City. It will bring the City some additional revenues, which we all need. And it will give the City some additional flexibility ... to make sure that the newsstands that operate on the public sidewalks are operated in such a manner that is consistent with the desires of ... elected officials ... and the members of the community.

Cummins Supp.Decl.Ex. A (comments of Craig Maraskin, Special Assistant and Director of Policy in the Office of the Deputy Mayor for Economic Development and Planning. at 7–9). *See also id.* at 39 ("Again, the Administration does believe that competitive bidding, which would allow a market rate to establish the correct rate for the operation of a newsstand ... is the best way to determine an actual number"); *id.* at 35 (comments of Council Member Spigner) ("[I]t's appropriate, I think to charge a more realistic rent for that space so the City can receive what that valuable location is worth."); *id.* at 53 (comments of Council Member Eristoff) ("Well, as you can understand from our perspective, we are in part concerned with City revenue and, frankly, you know, five months out of a 12–month period at $1,000 a month sure beats $500 for a year under the license system."); *id.* at 61 (comments of Chairperson Koslowitz) ("I agree that the City should make money"); *id.* at 54 (comments of Council Member Eristoff) (indicating view that amount of revenue from concessions should increase in future, and that current figure is "a political compromise"); Cummins Supp.

Decl.Ex. B (Public Hearing, at 18–19, May 16, 1997) (comments of Mayor at Bill Signing) ("[T]his legislation will permit the Administration to demonstrate that the best and most equitable way to determine how much the City should collect from newsstand operators is through a competitive bidding process reflective of the marketplace.").[9]

■ Moreover, under the New York City Charter, a "concession" is defined as "a grant made by an agency for the private use of city-owned property for which the city receives compensation other than in the form of a fee to cover administrative costs." New York City Charter § 362(a); *see also* 12 RCNY § 1–02 (same). Accordingly, the City Council's plan to transform the previous licensing scheme into a concession scheme suggests that the City intended to derive increasing revenues from the new scheme beyond the administrative costs of implementing it.[10]

Finally, the court considers it significant that in the City of New York's Financial Plan for fiscal years 1998–2002, published on January 29, 1988, the City included in a section of the plan entitled "Revenue Program," under a heading of "Miscellaneous Revenue," that the city expected to receive $956,000 per year for "issu[ing] concessions for newsstands formerly licensed by the Department of Consumer Affairs." Cummins Supp. Decl.Ex. D.[11]

Based on this evidence, the revenue raising aspect of the scheme appears to be an important component of the plan, rather than a mere incident to a regulatory system. *Cf. Marigold Foods, Inc. v. Redalen,* 834 F.Supp. 1163, 1166 (D.Minn.1993) (finding state scheme not a tax where milk wholesalers were required to pay an assessment into a segregated fund, to be distributed among Minnesota dairy producers, whenever milk prices fell below a certain minimum: purpose of system was not to raise revenue, but to fix a minimum price for milk).

The court also notes that under the *"Diginet"* test used by the court in *Hager* to separate "user fees" from "taxes," the same result would ensue. In *Diginet, Inc. v. Western Union ATS, Inc.,* 958 F.2d 1388 (7th Cir.1992), the court stated:

> If the fee is a reasonable estimate of the cost imposed by the person required to pay the fee, then it is a user fee and is within the municipality's regulatory power. If it is calculated not just to recover a cost imposed on the municipality or its residents but to generate revenues that the municipality can use to offset unrelated costs or confer unrelated benefits, it is a tax, whatever its nominal designation.

*Id.* at 1399 (finding franchise fee levied by municipality on user of fiber optic cable to be a tax). Applying this test, it is apparent that the occupancy charge is a tax. Whereas a license fee is calibrated to offset the costs of

---

**9.** Plaintiffs argue that City officials' characterization of the revenues from the plan as "rent" for the use of public property means those revenues could not have been intended as "taxes." This contention does not assist the analysis. Rent is payment for the use of property, presumably based on the market value of such use. The fact that its value is set by the market does not affect the analysis of whether it is properly viewed as either a "tax" or a "regulatory fee."

**10.** Plaintiffs argue that because Local Law 29 was not enacted pursuant to Municipal Home Rule Law §§ 10 and 11, which governs legislative procedures for New York City taxation measures, that it must therefore not be a tax. The court finds this argument unpersuasive, as determination of whether a measure is a tax for purposes of the Tax Injunction Act is a matter of federal, not state or local, law. *See, e.g., Ben Oehrleins and Sons and Daughter, Inc. v. Hennepin County,* 115 F.3d 1372, 1382 (8th Cir.1997)

(whether ordinance constitutes "tax" for purposes of Tax Injunction Act is question of federal law, and court "need not defer to the County's characterization of the Ordinance").

**11.** Plaintiffs claim that the costs to the City of administering the newsstand regulatory scheme were estimated in the City's budget at $836,000, a sum which approaches the estimated revenue projection of $956,000. *See* Celli Decl. ¶¶ 15–16. By Declaration of Anthony Delorenzo, the Deputy Assistant Director in charge of the Miscellaneous Revenue Budget at the New York City Office of Management and Budget, however, the City has explained that the $836,000 figure identified by plaintiffs does not represent an expenditure, but rather "the projected net revenue increase to the total financial plan" for combined fiscal years 1999 to 2002. Delorenzo Decl. ¶ 7. Plaintiffs do not challenge the accuracy of this statement, and thus the court accepts the City's explanation as correct.

administering and enforcing the licensing system,[12] the five- to ten-fold increase in the fee charged to newsstand vendors is far in excess of the costs of administration. The City states that such costs were not considered when the occupancy charges were established. That revenues derived from the occupancy charge bear no relationship to the costs of regulating the newsstand vendors and that no attempt was made to produce any such relationship are factors that weigh heavily in favor of treating the occupancy charge as a tax. *See Hager,* 84 F.3d at 871.

In sum, despite the regulatory benefits expected by the Council to be derived from the transition to a concession scheme, a significant stated purpose of Local Law 29 was' to raise general revenues. Similar types of fees and charges have repeatedly been viewed as "taxes" for the purposes of the Act, particularly in this Circuit. *See Travelers,* 14 F.3d at 713: *Keleher v. New England Tel. & Tel. Co.,* 947 F.2d 547, 549 (2d Cir. 1991) (finding city-assessed public utility "franchise fee" to be a "tax" since revenues derived thereby were treated as part of city's general revenue); *American Trucking Assoc., Inc. v. Conway,* 514 F.Supp. 1341 (D.Vt. 1981) (permit fees on interstate vehicles registered out-of-state were a "tax" where fees exceeded administrative costs of registration program, were earmarked for general fund, and intent of legislature was to raise revenue); *see also Indiana Waste Systems, Inc. v. County of Porter,* 787 F.Supp. 859 (N.D.Ind.1992) (special assessment by municipality is "tax," as is property tax, gross receipts tax, city license tax, and state permit fees); *Butler v. State of Me. Supreme Judicial Court,* 767 F.Supp. 17 (D.Me.1991) (finding jury fee promulgated by Maine Supreme Court and imposed on out-of-state litigants to be a tax); *Adams v. Board of Sup'rs of Henry County Va.,* 569 F.Supp. 20 (D.Va. 1983) (license fee on fortune tellers was tax).

Taking into consideration the broad construction that courts have consistently employed in this area, the court concludes that the "occupancy charge" is a tax for the purposes of the Tax Injunction Act. Accordingly,

the court has no jurisdiction to consider plaintiffs claim that the charge levies an impermissible tax on protected First Amendment activity.

## V. Equal Protection

Plaintiffs complain that the occupancy permit scheme has been imposed solely upon newsstands, and does not regulate other sidewalk vendors. They argue that this classification violates their rights under the Equal Protection Clause of the Fourteenth Amendment.

"The 'Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives.'" *National Awareness v. Abrams,* 50 F.3d 1159, 1167 (2d Cir.1995) (quoting *Police Dep't of the City of Chicago v. Mosley,* 408 U.S. 92, 101, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)). "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purposes for which the classification is made." *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); *accord Walters v. City of St. Louis,* 347 U.S. 231, 237, 74 S.Ct. 505, 98 L.Ed. 660 (1954). *Fetterusso v. State of New York,* 898 F.2d 322, 325 (2d Cir.1990). Thus, an equal protection claim must be predicated on differential treatment of similarly situated classes of people. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

In the present case, the court finds that the sidewalk vendors and plaintiffs are not similarly situated. None of the other vendors listed by plaintiffs—those selling books, clothing, music, movies and artwork—operate from semi-permanent structures on the city sidewalks, as do the newsstand vendors. The fact that only newsstand vendors occupy structures covered by the City's Coordinated Street Furniture Franchise Proposal provides a significant government in-

---

**12.** The City employs a detailed analysis in order to calculate the costs of a licensing scheme. The analysis takes into account such factors as pro-

jected executive management overhead, space and utilities, and the cost of other agency services. *See* Cummins Supp.Decl.Ex. C.

terest in designing a special regulatory framework for newsstand vendors.[13]

Implementation of the Proposal, of which passage of Local Law 29 was concededly a part, is a legitimate state objective. The intent to coordinate the regulation of street furniture reasonably includes newsstands.[14] The court has no basis upon which to conclude that the other sidewalk vendors present similar regulatory problems and fall into the category of street furniture reasonably targeted by the City for coordination. "Varying taxes and different permit requirements for obviously different uses do not merit word-by-word scrutiny by judges who might prefer to tax and regulate some other way." *Graff,* 9 F.3d at 1326. Accordingly, the court concludes that the ordinance, cured of the flaws described in Section III.3, is narrowly tailored to achieve the City's legitimate purposes.

Moreover, plaintiffs' equal protection claim adds little to their First Amendment claim, since the analytical basis of the two tests is similar. Under the First Amendment, a content-neutral regulation that restricts the time, place, and manner of protected speech is constitutionally acceptable, provided that it is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels for communication." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *see also Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Bery v. City of New York,* 97 F.3d 689, 697 (2d Cir.1996). Under the Equal Protection Clause, the Supreme Court has stated that: "[w]hen government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." *Carey v. Brown,* 447 U.S. 455, 461–62, 100

S.Ct. 2286, 65 L.Ed.2d 263 (1980). Under either test, a showing of a substantial state interest and narrow tailoring must be made to vindicate the ordinance. Because the First Amendment test also imposes a requirement that there be "ample alternative channels of communication" open to speakers, the First Amendment analysis is more stringent than the Equal Protection analysis, and, in most circumstances, a content-neutral ordinance that can withstand scrutiny under the First Amendment is not vulnerable to an Equal Protection challenge. As the Sixth Circuit recently said in a similar case, "the Equal Protection Clause adds nothing to the First Amendment analysis; if a sufficient rationale exists for the ordinance under the First Amendment, then the City has demonstrated a rational basis for the alleged disparate treatment under the Equal Protection Clause." *DLS, Inc. v. City of Chattanooga,* 107 F.3d 403, 411 n. 7 (6th Cir.1997) (citing *Renton,* 475 U.S. at 55 n. 4, 106 S.Ct. 925; *Young v. American Mini Theatres,* 427 U.S. 50, 63–73, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)); *see also Graff,* 9 F.3d at 1325 (holding that since newsstand ordinance passes strict scrutiny under First Amendment, it necessarily survives scrutiny under equal protection analysis).

For these reasons, the court concludes that there is no likelihood of success on the merits of plaintiffs' equal protection claim.

## CONCLUSION

For the reasons stated above, the court GRANTS in part plaintiffs' motion for a preliminary injunction and ENJOINS implementation and enforcement of Local Law 29 and the occupancy permit scheme insofar as they permit the Commissioner of the Department of Transportation to exercise unfettered discretion with respect to termination of any occupancy permit entered into or to be entered into by plaintiffs. In all other

---

13. That the proposal has not yet been implemented does not, as plaintiffs suggest, diminish the City's interest in designing a regulatory scheme that would facilitate its implementation.

14. *See* Cummins Decl.Ex. A (Minutes of Comm. on Consumer Affairs Mtg., at 3) (noting that "[n]ewsstands are a small but important part of this effort to coordinate and beautify the furniture on our City's sidewalks").

respects, the court DENIES plaintiffs' motion for a preliminary injunction.

SO ORDERED.